DAVID D. MITCHELL, PLAINTIFF IN ERROR, *v.* MANUEL X. HARMONY.

In some of the States it is the practice for the court to express its opinion upon facts, in a charge to the jury. In these States, it is not improper for the Circuit Court of the United States to follow the same practice.

During the war between the United States and Mexico, where a trader went into the adjoining Mexican provinces which were in possession of the military authorities of the United States, for the purpose of carrying on a trade with the inhabitants which was sanctioned by the executive branch of the government, and also by the commanding military officer, it was improper for an officer of the United States to seize the property upon the ground of trading with the enemy.

Private property may be taken by a military commander to prevent it from falling into the hands of the enemy, or for the purpose of converting it to the use of the public; but the danger must be immediate and impending, or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for.

The facts as they appeared to the officer must furnish the rule for the application of these principles.

But the officer cannot take possession of private property for the purpose of insuring the success of a distant expedition upon which he is about to march.

Whether or not the owner of the goods resumed the possession of them at any time after their seizure, was a fact for the jury. In this case, they found that he did not resume the possession and in this they were sustained by legal evidence.

The officer who made the seizure cannot justify his trespass by showing the orders of his superior officer. An order to commit a trespass can afford no justification to the person by whom it was executed.

The trespass was committed out of the limits of the United States. But an action for it may be maintained in the Circuit Court for any district in which the defendant may be found upon process against him, where the citizenship of the respective parties gives jurisdiction to a court of the United States.

Under the 18th rule of this court, the mode of calculating interest, when a judgment of the Circuit Court is affirmed, is to compute it at the rate of six per cent. per annum, from the day when judgment was signed in the Circuit Court until paid. (See report of the clerk and order of court at the end of this case.)

This case was brought up, by a writ of error, from the Circuit Court of the United States for the Southern District of New York.

Mitchell was an officer of the army, and was sued in an action of trespass by Harmony for seizing his property in the Mexican State of Chihuahua.

By an act passed on the 3d March, 1845, (5 Stat. at Large, 750) Congress allowed a drawback on foreign merchandise exported in the original packages to Chihuahua and Santa Fé, in Mexico. Harmony was a trader engaged in this business, and on the 27th of May, 1846, had transported to Independence, in Missouri, a large amount of goods imported under this law, and in conformity with the regulations of the Treasury Department. On the 27th of May he left Independence, with several other traders, before the passage of the act of Congress of 13th May, recognizing the existence of war with Mexico, was known there.

The whole history of Colonel Doniphan's expedition was given in the record, being collected from official documents and the depositions of persons who were present. A brief narrative is given in the opinion of the court of all the facts which bore upon the present case.

The declaration was in the usual form and contained three counts, all of them charging the same trespass, namely, that the defendant, on the 10th of February, 1847, at Chihuahua, in the Republic of Mexico, seized, took, drove, and carried away, and converted to his own use, the horses, mules, wagons, goods, chattels, and merchandise, &c., of the plaintiff, and compelled the workmen and servants of the plaintiff having charge, to abandon his service and devote themselves to the defendant's service. The property so alleged to have been taken is averred to be of the value of $90,000, and the damages, $100,000.

Besides the general plea of not guilty to the whole action, the defendant, Mitchell, pleaded several special pleas.

1st. That war existed at the time between the United States and Mexico; that he was a lieutenant-colonel, &c., forming a part of the military force of the United States, employed in that war, and under the command of Colonel A. W. Doniphan, and he justifies the taking, &c., under and in virtue of the order, to that effect, of his superior and commanding officer, Colonel Doniphan; that the order was a lawful one, which he was bound to obey, and that he was no otherwise instrumental in the alleged trespass.

2d. Alleging the same preliminary matter, avers that the plaintiff, Harmony, was a citizen of the United States, and, with a full knowledge of the war, had gone with his wagons, merchandise, &c., into Mexico with design to trade with the people of Mexico, and to afford aid to the same in said war; that said Doniphan, as he had a right to do, commanded the defendant to seize, take, &c., the said wagons, &c., and that he did, in obedience to said order take, &c., doing nothing more than was necessary to the execution of that order.

3d. With the same preliminary matter as in the second plea, justifies the taking by his own (Colonel Mitchell's) authority as an officer.

The three special pleas above stated are to the first count of the declaration.

To the second count the defendant pleaded of like effect with the above; and three like pleas were plead to the third count.

To the three first and three last pleas, that is, the pleas to the first and third counts, issues were joined to the country.

To the special pleas to the second count, the plaintiff replied as follows, to wit:— To the first, that the said Doniphan did not command the said horses, wagons, &c., to be stopped, taken, &c., nor were the same taken in contemplation of any proceeding in due course of law for any alleged forfeiture thereof, but to apply the same to the use of the United States without compensation to the plaintiff, of which the defendant had notice.

To the second, that the plaintiff did not carry his goods, &c., out of the United States, for any purpose of trading with the enemy, or elsewhere than in places subdued by the arms of the United States, and by license and permission; and that said Doniphan did not command the defendant to take the same for or on account of any supposed unlawful design of the plaintiff to trade with the enemy, &c., but to apply the same to the use of the United States, without compensation to the plaintiff.

To the third, that he did not, after notice of the war, carry his goods into Mexico, " except to and into such place and places as had been, and was, or were captured, subdued, and held in subjection by the forces of the United States," &c., and by the permission of the commanding officer of said forces; nor with design to carry on any friendly intercourse or trade with the citizens of Mexico hostile to the United States; and that the defendant did not, in the performance of his duty as lieutenant-colonel, seize, take, &c., said property, by reason of any supposed unlawful design of the plaintiff to trade with the enemy, &c., but the same was taken by the defendant of his own wrong, &c.

On all these pleas and replications, issues were joined to the country.

When the testimony was closed, the judge charged the jury. The whole of the charge is set forth in the dissenting opinion of Mr. Justice Daniel, and therefore need not be recited here. The bill of exceptions brought the whole charge up to this court. The jury found a verdict for the plaintiff for $90,806.44; for which and the costs, amounting to 5,048.94, the court gave judgment for Harmony.

The cause was argued in this court by *Mr. Crittenden,* (Attorney-General,) for the plaintiff in error, and *Mr. Cutting* and *Mr. Vinton* for the defendant in error. *Mr. Moore* also filed a printed brief.

*Mr. Crittenden,* for the plaintiff in error, contended that the charge was incorrect throughout, and founded upon misconception of the facts and the law, and that the judgment ought therefore to be reversed.

The principal points, as stated in the charge, and decided by the judge, are as follows : —

1st. " One ground on which the defence is placed, is, that the plaintiff was engaged in an unlawful trade with the enemy, and that, being engaged in an unlawful trade, his goods were liable to confiscation, and any person, particularly an officer of the army, could seize the same."

After thus stating the point, the judge tells the jury, " this ground has, as I understand the evidence, altogether failed."

The true point of the defence is here misconceived and misstated. It is not that the plaintiff was " *engaged* in unlawful trade with the public enemy," but that he had the " *design* " to engage in such trade, and thereby afford aid to the enemy, and that this authorized the means of prevention used by defendant. The pleadings show that the issue is expressly made on the " design," and not on any actual unlawful trade. The mind of the jury was thus misled from the true issue by the judge's misapprehension. If he had observed that the true issue and point of defence rested on the " design" of the plaintiff, could he have said that Harmony's repeated solicitations and manifest wishes to precede the army, and finally his secret preparations, attempted to be concealed by falsehood, to separate himself from that army in the midst of the enemy's country, were no evidence of a " design " to trade with that enemy, under the protection of his Spanish passport ? Or could he have said that such a " design " would not, in point of law, have justified the seizure of his wagons, goods, &c., and their detention, till the

danger was passed? I believe that the learned and honorable judge would have answered both these questions in the negative. The unlawfulness of trade with the enemy, and the right, under circumstances like those of the present case, to detain goods, designed for the enemy, and which might be "useful" to him, are doctrines supposed to be established by authority and reason. 2 Wildman's International Law, 8; 1 Kent's Com. 66; Grotius, book 3, ch. 1, pp. 1–11, and particularly p. 5.

The charge of the judge, therefore, on this first point, was inapplicable to the defence specifically made by plea, and, to say the least, was misleading.

2dly. The judge tells the jury: "Another ground taken by the defendant, and relied upon, depends upon another principle of public law, viz., the taking possession of the goods at a time and place when it was necessary for the purpose of preventing them from falling into the hands of the enemy."

If this is understood to imply that, to justify the taking of goods only where it is certain that they will otherwise fall into the hands of the enemy, then it seems to me that the principle of law is too strictly laid down. The principle, if there be use or reason in it, must extend to cases wherever a reasonable apprehension may be entertained that goods may fall into the enemy's hands.

But take the law to be as stated by the judge. He proceeds to say: "Taking the whole of the evidence together, and giving full effect to every part of it, we think this branch of the defence has also failed. No case of peril or danger has been proved which would lay a foundation for taking possession of the goods of the plaintiff," &c.

He adds, "the peril must be immediate and urgent," &c.; "in this case there was no immediate or impending danger," &c.

With respect, I must say that this part of the charge is not a comment on the evidence, it is a peremptory decision, a positive conclusion of facts from the evidence, which ought to have been left to the jury; and the law and the fact are so blended that no jury could well distinguish the one from the other.

The judge tells the jury that no "immediate and urgent peril" was proved in this case. It seems to me that the depositions of Doniphan and Clark, before referred to, do prove such a peril, in the strongest manner, and in the most eminent degree; and that the judge, mistaking the evidence, misled the jury as to the fact.

The charge is furthermore erroneous in requiring that the peril should be "immediate," "impending," "urgent." The principle of public law which the judge lays down does not re-

quire it. But the radical error is, that the charge throws the burden upon the defendant of proving in court all the circumstances that conduce to make up the required peril, and that it makes the court or jury, judges of those circumstances, as of a *res integra*, without allowing any effect to the decision of the defendant, or his commander, by whose authority the goods of the plaintiff are alleged to have been received.

The law made it the business of the commander to decide, in the first instance, whether the peril was such, and the condition of his army and of the enemy such, as required their seizure and detention, and his decision must be entitled to some respect. Unless the integrity of his judgment can be impeached, that decision stands as proof and protection for him, against any suit or legal proceeding against him. He, no more than a judge on the bench, can be sued for a mere mistake of judgment, if mistake he has made. This is as true in respect to military, as it is in respect to civil officers, and as true in respect to the exercise of military, as of civil authority. Crowell et al *v.* McFadon, 8 Cranch, 94; 9 Cranch, 355; Martin *v.* Mott, 12 Wheat. 19–33; 9 Peters, 134; Wilkes *v.* Dinsman, 7 How. 128, 129; Luther *v.* Borden; Id. 45, et seq.

These authorities fully, I think, establish the doctrine for which I contend, and the incorrectness of the instructions given to the jury in this respect.

3dly. The next and third point of the charge is this: "The next ground of defence, and which constitutes the principal question in the case, and upon which it must probably ultimately turn, is the taking of the goods by the public authorities for public use."

In respect to this the judge admits the "right of a military officer, in a case of extreme necessity-of the government of the army, to take private property for the public service." But then the judge further tells the jury, "in my judgment, all the evidence taken together does not make out an immediate peril or urgent necessity existing at the time of the seizure, which would justify the officer in taking private property and impressing it into the public service; the evidence does not bring the case within the principle of extreme necessity," &c.

Against this particular charge the plaintiff in error relies upon and urges all the exceptions and objections made to the preceding charges, and upon the authorities cited above. The seizure, as it is called, was in this case made by a military officer; he must decide in the first instance whether an "extreme necessity," (if that be required,) "for the safety of the army," made it proper to make the seizure. If the law made it his duty to decide it, and he gave an honest, though mistaken, judgment on

the subject, will the same law hold him personally responsible for it?

Let the reason of the case, and the authorities last cited, answer the question. Yet, by the charge, the military question decided by the general in the field, and in the midst of danger, is to be rejudged in court, *de novo*. This cannot be either justice or law. To make the military officer in such a case liable, it must be shown that his decision was corrupt, malicious, or, at least, without any reasonable ground.

If this view of the subject be in any degree right, the charge must be erroneous.

4thly. The judge says, " as to the remaining grounds of defence, the liability of the defendant for taking the goods and appropriating them to the public service, accrued at the time of the seizure. If it was an unlawful taking, the liability immediately attached; and the question was, whether that liability had been discharged or released by any subsequent act of the plaintiff. Colonel Mitchell, who executed the order, was not alone responsible; Colonel Doniphan, who gave the order, was also liable; they were jointly and severally responsible. Then, was any act done by the plaintiff which waived the liability, or by which he resumed the ownership and possession of the goods?" On this question the judge doubts " if there be any evidence showing an intent, on the part of the plaintiff, to resume ownership over the goods, &c., or any act done by him that would, when properly viewed, lead to that result."

In reviewing this last charge, it is to be remembered that Harmony was never deprived of the ownership, or even the possession, of his property, otherwise than constructively, by force of the order of the 10th February, 1847, which required him to accompany the army, and which order he obeyed. He retained ownership and possession, but was constrained to use those rights in a particular manner, and he did so use them. There is more and better ground to " doubt" whether he was ever deprived of ownership or possession, than to " doubt" whether he ever " resumed" that ownership and possession. He certainly, and by all the evidence, did have uncontrolled possession, and exercised uncontrolled ownership of the goods, from their arrival at the city of Chihuahua. There is no room for any doubt as to this fact. It is in effect admitted, and the attempt is made to qualify it, by alleging that Harmony took possession of said goods, and made sales of them, under agreement and arrangement with Colonel Doniphan. Now, if this was so, by what series of implications, by what accumulation of constructions construed, can the defendant, Mitchell, be made responsible, under the arrangement, for the whole value

of the goods, merely because of the trespass, if trespass it was, committed by him on the evening preceding the 10th of February, 1847? It might as reasonably be pretended by Harmony, if he had retailed his goods in Chihuahua, and any of the purchasers had failed to pay the price, that Mitchell was responsible for that price, because it all came from his old trespass. Yet the plain import of this charge is to make Mitchell liable for all the goods, notwithstanding that said Harmony had made them the subject of a subsequent contract with Doniphan, under which, as Harmony has attempted to prove, these same goods were lost by the inattention and negligence of Doniphan.

There seems, therefore, that there was no legal ground to make Mitchell liable to the extent to which he is made so by this charge, and that it is therefore erroneous.

But, as it appears to me, the great error of this part of the judge's charge is in his telling the jury, in effect, that the order of Colonel Doniphan afforded no legal defence or protection to Colonel Mitchell. The judge said that " Colonel Mitchell, who executed the order, was not alone responsible; Colonel Doniphan, who gave the order, was also liable; they were jointly and severally responsible," &c.

On the part of Mitchell, it is most respectfully, but earnestly, contended that this instruction to the jury is not warranted by law, but is directly contrary to law.

The order was such a one as Mitchell was bound by law to obey; and it would be contradictory in the law to bind him to obey, and then to punish him for obeying.

In addition to the cases and authorities cited on the 2d point, and which are relied on as particularly applicable to this, the court is referred to the act of Congress of the 10th of April, 1806, " for establishing rules and articles for the government of the armies of the United States," and particularly the 9th article of the 1st section, which makes disobedience to the " lawful command of his superior officer " punishable, at the discretion of a court-martial, with death. 2 Stat. at Large, 361.

If the judge, by his charge, meant to say that, in his opinion, there was no evidence — no competent evidence — before the jury to maintain the two grounds of defence first alluded to by him, then the questions he decided were questions of law, just as much as questions arising on demurrers to evidence, and were proper to be decided by the judge, and not by the jury.

Considering it, then, as a question of law, like that arising on a demurrer to evidence for some material defect, it becomes necessary to examine the evidence, to ascertain whether the question of law has been correctly determined. To that exa-

mination the plaintiff in error confidently appeals, to show that the charge in this particular is plainly erroneous.

The points made by the counsel for the defendant in error were the following:

*First.* In respect to any justification of the seizure and use of the property, based upon an alleged unlawful trading with the enemy.

1. The evidence tended to prove, and the jury found, that the plaintiff below was not engaged in illegal trading, or, in the language of the pleadings and authorities, "in affording aid or assistance to the enemy;" that neither the defendant nor Colonel Doniphan arrested his property as being forfeited, nor had grounds for so doing; but that this was merely an after-thought, other grounds having been alleged; and that the plaintiff, for all the trading he pursued or contemplated, had the sanction and license of Colonel Doniphan and of the defendant himself, and their superior officers, up to the President; and was acting to "aid and assist" the United States, and the policy of our government, attaching himself to its interests, trading under its protection, facilitating its supplies, and uniting himself with its fate; and simply declining (as he well might) to devote his property gratuitously to what an inferior agent supposed was the public service.

2. The law involved in the charge on this point was correctly stated. The plaintiff, a citizen of the United States, acting under such sanction and permission as he had, could rightfully and legally trade with the Mexicans:

(*a.*) In a territory and with inhabitants reduced to subjection. The United States *v.* Rice, 4 Wheat. Rep. 246; 2 Gall. Rep. 501; Fleming *v.* Page, 9 How. Rep. 603, and authorities there cited:

(*b.*) Under such license to trade as was given; which was within the competency of the officers who granted it, and a common course in prosecuting a campaign under a variety of circumstances; "so to modify the relations of a state of war as to permit commercial intercourse." The William Penn, 3 Wash. C. C. R. 484; The George, 1 Mason, Rep. 24; The Julia, 8 Cranch, Rep. 181; Scholefield *v.* Eichelberger, 7 Pet. R. 592.

The Secretary of War was the proper organ of government. The United States *v.* Eliason, 16 Pet. 302.

3. The defendant could not arrest for examination, and then proceed with the property in pursuit of other objects, without deciding to seize as forfeited, or to restore. No delay for examination was necessary; nor can delays be tolerated which may operate oppressively. The Anna Maria, 2 Wheat. Rep. 327; Maley *v.* Shattuck, 3 Cranch, 458.

.4. Defendant cannot be permitted to treat the property.as arrested for the cause alleged, or, for the purpose of trial and condemnation, as forfeited, or as in fact forfeited, when the conduct of all throughout has been so inconsistent with that idea; when he did not, in fact, arrest it for that cause and purpose. He cannot deprive the plaintiff of the rights to which he is entitled on such a trial, nor dispose of the property as if condemned. The cause alleged for the seizure is important and issuable. If an officer even have legal process in his hands, and do not act under it, it is no justification. If he legally arrest property for probable cause of forfeiture, he cannot damage it, or convert it to his use with impunity. See cases above cited. Lucas *v*. Nockells, 4 Bing. Rep. 729; The Eleanor, 2 Wheat. 345; Del Col *v*. Arnold, 3 Dall. Rep. 333.

*Second.* In respect to the justification set up on the trial, but not in the pleadings, of taking the property, lest it should fall into the hands of the enemy.

1. The evidence tended to prove, and the jury found, the facts to be as understood and referred to by the judge; that El Paso and its neighborhood, including the presidio or fort of San Eleasario, at which the property was at the time of seizure, were in the possession of the arms of this government; that there was no public force of the enemy at the time in its neighborhood which put the goods in danger of being captured; that the plaintiff's property stood in the same condition as that of any other trader in the country; that there was no immediate or urgent peril of its falling into the enemy's hands, and, at the most, only a contingent and remote peril; that there was no impending danger — no enemy present or advancing; and that the plaintiff was able and willing to defend himself against marauding parties.

2. The rules of law stated were correct; the peril must be great, immediate, and urgent, such as an enemy near or advancing; not remote, and the attack uncertain and contingent. A mere general exposure of the property to capture, from a hostile public force, not near nor advancing, but at rest 200 miles distant, or from irregular marauding parties, to which all property is exposed during war, and particularly so on a frontier, cannot be sufficient to justify the seizure. Mayor, &c. of New York *v*. Lord, 17 Wend. 285; 18 Id. 126; and cases referred to; so " to prevent the spreading of a fire, the ravages of a pestilence, the advance of a hostile army, or any other great public calamity," per Chancellor Walworth, Ibid. p. 129. A jettison during an impending peril, Ibid. p. 130.

3. The person or property of a citizen cannot be seized and carried away by an inferior officer, and the latter be justified by

a mere order of his official superior, not stating any cause, and being in fact without cause. Such an order during war is different from one during peace, only as it affords a justification against the public enemy, or against one acting, at the time, with or in the garb of an enemy.

4. The pleadings do not sufficiently set up the present defence to admit of it. Two of the pleas to each count are confined to the cause of illegal trading, and do not even allege a forfeiture for that cause. See Gelston v. Hoyt, 3 Wheat. 246; Hall v. Warren, 2 McLean's Rep. 332.

The other one (the first one of each set) is radically defective. It neither avers any forfeiture or cause of arrest, nor sufficiently states the facts and circumstances to show the authority and jurisdiction of Colonel Doniphan.

(a.) Such facts are necessary to be averred in order that issue may be taken upon them; and that the plaintiff may not have his property taken for one pretence, and be exposed to the hazard of a trial upon various different pretences, of which he had no notice. See Precedents, 3 Chitty's Plead. 1081 – 1094, &c.

(b.) The stopping, seizing, taking, driving, and carrying away of the personal property of a citizen, damaging and converting it, cannot be justified by a mere order of a military officer during war. Gelston v. Hoyt, 3 Wheat. 246, originally 13 Johns. Rep. 561; Murray v. The Charming Betsy, 2 Cranch, Rep. 64. [Express orders of the President to capture in a *quasi* war. No justification of an arrest and bringing in for trial. Officer excused, under the circumstances, only from vindictive damages.]

(c.) It results that, if the existence of a military necessity be requisite to make the command lawful, that fact should have been pleaded, and must be established. If, under any conceivable circumstances of danger, Colonel Doniphan's or the defendant's own judgment of the existence of such a necessity would have an effect to make the seizure justifiable, (and without such a judgment it clearly cannot be justified, even if it can with it,) then the circumstances of danger, and the fact of such judgment having been given, and the order and action based only upon that cause, should have been distinctly pleaded, (so that the defendant might be held to prove them, and the plaintiff be prepared to controvert them); and all these should have been clearly established, which they were not. Under whatever color the acts may have been committed, the truth, good faith, and sufficiency of the cause alleged are the subjects of investigation as questions of fact without regard to the official station. Wilson v. Mackenzie, 7 Hill, Rep. 95, citing Sutton v. Johnstone; 1 Term Rep. 544, and 1 McArthur on Courts Martial, 268, 4th Ed., and 436, Appendix, No. 24;

11*

Percival *v*. Hickey, 18 Johns. Rep. 257 ; and see cases cited under the 3d and 4th subdivisions of the 1st point.

*Third.* In respect to the remaining ground set up ·on the trial, but not in the pleadings, viz. : that the taking the property, its damage, or conversion, was for public use, and was justified, without other authority, by necessity.

1. The evidence tended to prove, and the jury found, that there was no such necessity ; that there was no immediate, existing, impending and urgent occasion for the seizure ; but that the property was taken on the frontier, (by an inferior officer, not instructed by the government, nor even by any general officer, and in the contingency that happened of General Wool not being in Chihuahua,) for the purpose of strengthening an invading force against Chihuahua, and of attacking a fortification more than 200 miles distant, in the interior of the enemy's country ; and even for this it was not urgently necessary. The finding of the jury, if it admitted that the property was taken for and. applied to the public use, declared that it was so taken and so used without the requisite authority to justify it. It appeared there had been an application to Congress to declare or recognize the necessity, which had not been successful.

2. The· limitations of the charge, as to the character of the necessity requisite to justify such a seizure, were just, and did not prejudice the defendant. " An immediate, existing, impending, and urgent· necessity " as explained and exemplified in the charge, was at least indispensable. See authorities under 2d subdivision of the 2d point.

3. A forced service beyond the realm has always been condemned. The war could not legally be presumed to be urged for purposes of conquest, nor for the capture or acquisition of Chihuahua even by ordinary means. The use of extraordinary means for an invasion and capture of a city and by· an inferior officer acting without orders, was in every respect unauthorized and illegal. Fleming *v*. Page, 9 How. Rep. 603 ; 1 Rolle, Abr. 116, 1. 10, ad. 30 ; 2 Inst. 47 ; 1 Black. Comm. 139 ; Lyon *v*. Jerome, 26 Wend. 485, 491, 492, 494.

4. Private property cannot be taken for public use without compensation and against the consent of the owner. The officer who so takes it is subject to an action for its value. The duty of the government to compensate for property taken and applied to the public service is well established ; but· compensation cannot be given without legislative sanction ; and no discretionary power existing in any executive officer (much less an inferior one acting without orders) to compel the citizen to furnish property or funds, or to suffer from its being taken, can be tolerated under our system of government. The legislature

cannot be put under such an obligation or duty, to indemnify the sufferer, nor the citizen be turned over to Congress, by any one, compulsorily, for such redress. The actor against the citizen must be responsible until compensation be given. He may also be liable to an extent which the government may not sanction, by reason of his resorting to an unjustifiable course, or taking too much, or of a wrong kind, or wasting or using it. The indemnity which the government may or ought to afford him, is no defence to a suit. The defendant, therefore, is responsible to the plaintiff even if the supposed necessity had clearly existed, and the charge on this point is wholly in favor of the defendant, and not exceptionable. Art. 4 and 5 of Amendments to Constitution; Van Horne's Lessee *v.* Dorrance, 2 Dall. Rep. 311; Compensation Act of 9th April, 1816, sect. 6, 3 U. S. Stat. at Large, 262; Gelston *v.* Hoyt, 3 Wheat. 246; 13 Johns. Rep. 139, 561; Ship American Eagle and cargo, seized by order of the President, as fitted out for illegal purposes: verdict, $107,000; American State Papers, Claims, p. 601; Report of Committee, No. 427; also p. 475, No. 311; Appropriation Act, 9 April, 1818, 3 U. S. Stat. at Large, 418; Act for relief of Gelston's Ex'r, 7 July, 1838, c. 200, 6 U. S. Stat. at Large, 728; Case of Major Austin and Lieut. Wells, seizing disaffected persons under orders of Gen. Pike, American State Papers, Claims, p. 545; Reports of Committee, 15th Cong. 1st Sess. Nos. 379, 431; Act for their relief, April 20, 1818, c. 75, 6 U. S. Stat. at Large, 210; Case of General Swartwout, impressing boats in an emergency, by order of General Wilkinson, American State Papers, Claims, p. 649; Report of Committee, No. 44, and p. 731; Report, No. 526; Act for his relief, 3d March, 1821, c. 55, 6 U. S. Stat. at Large, 261; Case of teamster in Canada, seizing rum by order of Col. Clark, American State Papers, Claims, p. 523; Report of Committee, 14 Cong. 2d Sess. No. 350. Other cases of impressments, &c., 6 U. S. Stat. at Large, 146, 162, 171, 240, c. 26, 162, 173, 125, 38; Report, No. 294, p. 462. Bloodgood *v.* Mohawk & H. R. R. Co. 18 Wend. Rep. 16, 17, 31, 42.

5. The pleadings and the proofs were subject to the same objection under this point, as stated in the last subdivision to the third point.

6. The cause of action being transitory, and not merely against the peace, but affecting property, there is no objection to impleading the defendant wherever he can be found. McKenna *v.* Fisk, 1 How. Rep. 248; 18 Johns. Rep. 257; 7 Hill, Rep. 95, before cited.

*Fourth.* The directions as to the time when the liability attached, and as to the transactions with Colonel Doniphan, not

being sufficient to discharge the defendant, were correct. The evidence tended to prove, and the jury found, that there had been no intent to resume ownership, nor any release of liability. There was nothing in placing the goods subject to the order of Colonel Doniphan, when the plaintiff could no longer attend to or watch them, that amounted in itself to any release or resumption of ownership inconsistent with the liability of the defendant. Plaintiff was not bound to trade with the enemy, nor to accept the property in such a different and hostile place, under such different circumstances, damaged, scattered, destroyed, and impossible to be saved; and he did not so accept it. Whatever he could save he had a right to save, without impairing his right of action, or deducting any thing more than he could realize. Conrad v. Pacific Ins. Co. 6 Peters, 274, and cases there referred to.

*Fifth.* The discussion by counsel and opinion by the court, after the testimony was closed, before the counsel summed up in form, were without objection or exception; it was convenient and appropriate in such a case of voluminous written testimony and peculiar circumstances; it involved the necessity of commenting upon facts, before a formal summing up by counsel; but this also was without objection or exception. The comments of the court are to be treated as if made by way of hypothesis, and for purposes of illustration; they took nothing from the jury. It was left to the jury to say whether their views of the evidence accorded with the judge's review of them, addressed to the jury for their consideration; they cannot be the ground of exception or review. Carver v. Astor, 4 Peters, Rep. 1, 23, 80, &c.

There was, in fact, no exception. These and various other matters are out of place in the bill of exceptions. Rule 38 of January Term, 1832; Zeller v. Eckert, 4 How. Rep. 297; United States v. Morgan, 11 How. Rep. 158.

Mr. Chief Justice TANEY delivered the opinion of the court.

This is an action of trespass brought by the defendant in error, against the plaintiff in error, to recover the value of certain property taken by him, in the province of Chihuahua during the late war with Mexico.

It appears that the plaintiff, who is a merchant of New York, and who was born in Spain, but is a naturalized citizen of the United States, had planned a trading expedition to Santa Fé, New Mexico, and Chihuahua, in the Republic of Mexico, before hostilities commenced; and had set out from Fort Independence, in Missouri, before he had any knowledge of the declaration of war. As soon as the war commenced, an expedition was

prepared under the command of General Kearney, to invade New Mexico; and a detachment of troops was set forward to stop the plaintiff and other traders until General Kearney came up, and to prevent them from proceeding in advance of the army.

The trading expedition in which the plaintiff and the other traders were engaged, was, at the time they set out, authorized by the laws of the United States. And when General Kearney arrived they were permitted to follow in the rear and to trade freely in all such places as might be subdued and occupied by the American arms. The plaintiff and other traders availed themselves of this permission and followed the army to Santa Fé.

Subsequently General Kearney proceeded to California, and the command in New Mexico devolved on Colonel Doniphan, who was joined by Colonel Mitchell, who served under him, and against whom this action was brought.

It is unnecessary to follow the movements of the troops or the traders particularly, because, up to the period at which the trespass is alleged to have been committed at San Elisario, in the province of Chihuahua, it is conceded that no control was exercised over the property of the plaintiff, that was not perfectly justifiable in a state of war, and no act done by him that had subjected it to seizure or confiscation by the military authorities.

When Colonel Doniphan commenced his march for Chihuahua, the plaintiff and the other traders continued to follow in the rear and trade with the inhabitants, as opportunity offered. But after they had entered that province and were about to proceed in an expedition against the city of that name, distant about 300 miles, the plaintiff determined to proceed no further, and to leave the army. And when this determination was made known to the commander at San Elisario he gave orders to Colonel Mitchell, the defendant, to compel him to remain with and accompany the troops. Colonel Mitchell executed the order, and the plaintiff was forced, against his will, to accompany the American forces with his wagons, mules and goods, in that hazardous expedition.

Shortly before the battle of Sacramento, which was fought on the march to the town of Chihuahua, Colonel Doniphan, at the request of the plaintiff, gave him permission to leave the army and go to the hacienda of a Mexican by the name of Parns, about eight miles distant, with his property. But the plaintiff did not avail himself of this permission; and apprehended, upon more reflection, that his property would be in more danger there than with the army; and that a voluntary acceptance on his part, and

resuming the possession at his own risk, would deprive him of any remedy for its loss if it should be taken by the Mexican authorities. He remained therefore with the troops until they entered the town. His wagons and mules were used in the public service in the battle of Sacramento, and on the march afterwards. And while the town remained in possession of the American forces he endeavored, but without success, to dispose of his goods. When the place was evacuated they were therefore unavoidably left behind, as nearly all of his mules had been lost in the march and the battle. He himself accompanied the army, fearing that his person would not be safe if he remained behind, as he was particularly obnoxious, it seems, to the Mexicans, because he was a native of Spain, and came with a hostile invading army.

When the Mexican authorities regained possession of the place, the goods of the plaintiff were seized and confiscated, and were totally lost to him. And this action was brought against Colonel Mitchell, the defendant, in the court below, to recover the damages which the plaintiff alleged he had sustained by the arrest and seizure of his property at San Elisario, and taking it from his control and legal possession.

This brief outline is sufficient to show how this case has arisen. The expedition of Colonel Doniphan, and all its incidents, are already historically known, and need not be repeated here.

At the trial in the Circuit Court the verdict and judgment were in favor of the plaintiff; and this writ of error has been brought upon the ground that the instructions to the jury by the Circuit Court, under which the verdict was found, were erroneous.

Some of the objections taken in the argument here, on behalf of the defendant, have arisen from a misconception of the instructions given to the jury. It is supposed that these directions embraced questions of fact as well as of law, and that the court took upon itself the decision of questions arising on the testimony, which it was the exclusive province of the jury to determine. But this is an erroneous construction of the exception taken at the trial. The passages in relation to questions of fact are nothing more than the inferences which in the opinion of the court were fairly deducible from the testimony; and were stated to the jury not to control their decision, but submitted for their consideration in order to assist them in forming their judgment. This mode of charging the jury has always prevailed in the State of New York, and has been followed in the Circuit Court ever since the adoption of the Constitution.

The practice in this respect differs in different States. In some of them the court neither sums up the evidence in a charge to the jury nor expresses an opinion upon a question of fact. Its

charge is strictly confined to questions of law, leaving the evidence to be discussed by counsel, and the facts to be decided by the jury without commentary or opinion by the court.

But in most of the States the practice is otherwise; and they have adopted the usages of the English courts of justice, where the judge always sums up the evidence, and points out the conclusions which in his opinion ought to be drawn from it; submitting them, however, to the consideration and judgment of the jury.

It is not necessary to inquire which of these modes of proceeding most conduces to the purposes of justice. It is sufficient to say that either of them may be adopted under the laws of Congress. And as it is desirable that the practice in the courts of the United States should conform, as nearly as practicable, to that of the State in which they are sitting, that mode of proceeding is perhaps to be preferred which, from long established usage and practice, has become the law of the courts of the State. The right of a court of the United States to express its opinon upon the facts in a charge to the jury was affirmed by this court in the case of M'Lanahan *v.* The Universal Insurance Co., 1 Pet. 182, and Games *v.* Stiles, 14 Pet. 322. Nor can it be objected to upon the ground that the reasoning and opinion of the court upon the evidence may have an undue and improper influence on the minds and judgment of the jury. For an objection of that kind questions their intelligence and independence, qualities which cannot be brought into doubt without taking from that tribunal the confidence and respect which so justly belong to it, in questions of fact.

It was in pursuance of this practice, that the proceedings set forth in the exceptions took place. When the testimony was closed and the questions of law had been raised and argued by counsel, the court stated to them the view it proposed to take of the evidence in the charge about to be given. And it is evident, from the statement in the exception, that this was done for the purpose of giving the counsel for the respective parties an opportunity of going before the jury, to combat the inferences drawn from the testimony by the court, if they supposed them to be erroneous or open to doubt.

It appears from the record that the counsel on both sides declined going before the jury, evidently acquiescing in the opinions expressed by the court, and believing that they could not be successfully disputed. And the judge thereupon charged the jury that if they agreed with him in his view of the facts that they would find for the plaintiff, otherwise for the defendant; and upon this charge the jury found for the plaintiff, and assessed the damages stated in the proceedings. It is manifest, therefore, that

the Circuit Court did not, in its instructions, trench upon the province of the jury, and that the jury could not have been misled as to the nature and extent of their own duties and powers. The decision of the facts was fully and plainly submitted to them. And their verdict for the plaintiff, upon the charge given to them, affirms the correctness of the views taken by the court; and the opinions upon the evidence as therein stated must now be regarded as facts found by the jury ; and as such are not open to controversy in this court.

This statement of the manner in which the case was disposed of in the Circuit Court was necessary to disengage it from objections which do not belong to it, and to show what questions were decided by the court below, and are brought up by this writ of error. We proceed to examine them.

It is admitted that the plaintiff, against his will, was compelled by the defendant to accompany the troops with the property in question when they marched from San Elisario to Chihuahua; and that he was informed that force would be used if he refused. This was unquestionably a taking of the property, by force, from the possession and control of the plaintiff; and a trespass on the part of the defendant, unless he can show legal grounds of justification.

He justified the seizure on several grounds.

1. That the plaintiff was engaged in trading with the enemy.

2. That he was compelled to remain with the American forces, and to move with them, to prevent the property from falling into the hands of the enemy.

3. That the property was taken for public use.

4. That if the defendant was liable for the original taking, he was released from damages for its subsequent loss, by the act of the plaintiff, who had resumed the possession and control of it before the loss happened.

5. That the defendant acted in obedience to the order of his commanding officer, and therefore is not liable.

The first objection was overruled by the court, and we think correctly.

There is no dispute about the facts which relate to this part of the case, nor any contradiction in the testimony. The plaintiff entered the hostile country openly for the purpose of trading, in company with other traders, and under the protection of the American flag. The inhabitants with whom he traded had submitted to the American arms, and the country was in possession of the military authorities of the United States. The trade in which he was engaged was not only sanctioned by the commander of the American troops, but, as appears by the record, was permitted by the Executive Department of the government,

whose policy it was to conciliate, by kindness and commercial intercourse, the Mexican provinces bordering on the United States, and by that means weaken the power of the hostile government of Mexico, with which we were at war. It was one of the means resorted to to bring the war to a successful conclusion.

It is certainly true, as a general rule, that no citizen can lawfully trade with a public enemy; and if found to be engaged in such illicit traffic his goods are liable to seizure and confiscation. But the rule has no application to a case of this kind; nor can an officer of the United States seize the property of an American citizen, for an act which the constituted authorities, acting within the scope of their lawful powers, have authorized to be done.

Indeed this ground of justification has not been pressed in the argument. The defence has been placed, rather on rumors which reached the commanding officer and suspicions which he appears to have entertained of a secret design in the plaintiff to leave the American forces and carry on an illicit trade with the enemy, injurious to the interests of the United States. And if such a design had been shown, and that he was preparing to leave the American troops for that purpose, the seizure and detention of his property, to prevent its execution, would have been fully justified. But there is no evidence in the record tending to show that these rumors and suspicions had any foundation. And certainly mere suspicions of an illegal intention will not authorize a military officer to seize and detain the property of an American citizen. The fact that such an intention existed must be shown; and of that there is no evidence.

The 2d and 3d objections will be considered together, as they depend on the same principles. Upon these two grounds of defence the Circuit Court instructed the jury, that the defendant might lawfully take possession of the goods of the plaintiff, to prevent them from falling into the hands of the public enemy; but in order to justify the seizure the danger must be immediate and impending, and not remote or contingent. And that he might also take them for public use and impress them into the public service, in case of an immediate and pressing danger or urgent necessity existing at the time, but not otherwise.

In the argument of these two points, the circumstances under which the goods of the plaintiff were taken have been much discussed, and the evidence examined for the purpose of showing the nature and character of the danger which actually existed at the time or was apprehended by the commander of the American forces. But this question is not before us. It is a question of fact upon which the jury have passed, and their verdict has decided that a danger or necessity, such as the court described,

did not exist when the property of the plaintiff was taken by the defendant. And the only subject for inquiry in this court is, whether the law was correctly stated in the instruction of the court; and whether any thing short of an immediate and impending danger from the public enemy, or an urgent necessity for the public service, can justify the taking of private property by a military commander to prevent it from falling into the hands of the enemy or for the purpose of converting it to the use of the public.

The instruction is objected to on the ground, that it restricts the power of the officer within narrower limits than the law will justify. And that when the troops are employed in an expedition into the enemy's country, where the dangers that meet them cannot always be foreseen, and where they are cut off from aid from their own government, the commanding officer must necessarily be intrusted with some discretionary power as to the measures he should adopt; and if he acts honestly, and to the best of his judgment, the law will protect him. But it must be remembered that the question here, is not as to the discretion he may exercise in his military operations or in relation to those who are under his command. His distance from home, and the duties in which he is engaged, cannot enlarge his power over the property of a citizen, nor give to him, in that respect, any authority which he would not, under similar circumstances, possess at home. And where the owner has done nothing to forfeit his rights, every public officer is bound to respect them, whether he finds the property in a foreign or hostile country, or in his own.

There are, without doubt, occasions in which private property may lawfully be taken possession of or destroyed to prevent it from falling into the hands of the public enemy; and also where a military officer, charged with a particular duty, may impress private property into the public service or take it for public use. Unquestionably, in such cases, the government is bound to make full compensation to the owner; but the officer is not a trespasser.

But we are clearly of opinion, that in all of these cases the danger must be immediate and impending; or the necessity urgent for the public service, such as will not admit of delay, and where the action of the civil authority would be too late in providing the means which the occasion calls for. It is impossible to define the particular circumstances of danger or necessity in which this power may be lawfully exercised. Every case must depend on its own circumstances. It is the emergency that gives the right, and the emergency must be shown to exist before the taking can be justified.

In deciding upon this necessity, however, the state of the facts, as they appeared to the officer at the time he acted, must govern the decision; for he must necessarily act upon the information of others as well as his own observation. And if, with such information as he had a right to rely upon, there is reasonable ground for believing that the peril is immediate and menacing, or the necessity urgent, he is justified in acting upon it; and the discovery afterwards that it was false or erroneous, will not make him a trespasser. But it is not sufficient to show that he exercised an honest judgment, and took the property to promote the public service; he must show by proof the nature and character of the emergency, such as he had reasonable grounds to believe it to be, and it is then for a jury to say, whether it was so pressing as not to admit of delay; and the occasion such, according to the information upon which he acted, that private rights must for the time give way to the common and public good.

But it is not alleged that Colonel Doniphan was deceived by false intelligence as to the movements or strength of the enemy at the time the property was taken. His camp at San Elisario was not threatened. He was well informed upon the state of affairs in his rear, as well as of the dangers before him. And the property was seized, not to defend his position, nor to place his troops in a safer one, nor to anticipate the attack of an approaching enemy, but to insure the success of a distant and hazardous expedition, upon which he was about to march.

The movement upon Chihuahua was undoubtedly undertaken from high and patriotic motives. It was boldly planned and gallantly executed, and contributed to the successful issue of the war. But it is not for the court to say what protection or indemnity is due from the public to an officer who, in his zeal for the honor and interest of his country, and in the excitement of military operations, has trespassed on private rights. That question belongs to the political department of the government. Our duty is to determine under what circumstances private property may be taken from the owner by a military officer in a time of war. And the question here is, whether the law permits it to be taken to insure the success of any enterprise against a public enemy which the commanding officer may deem it advisable to undertake. And we think it very clear that the law does not permit it.

The case mentioned by Lord Mansfield, in delivering his opinion in Mostyn v. Fabrigas, 1 Cowp. 180, illustrates the principle of which we are speaking. Captain Gambier, of the British navy, by the order of Admiral Boscawen, pulled down the houses of some sutlers on the coast of Nova Scotia, who

were supplying the sailors with spirituous liquors, the health of the sailors being injured by frequenting them. The motive was evidently a laudable one, and the act done for the public service. Yet it was an invasion of the rights of private property, and without the authority of law, and the officer who executed the order was held liable to an action, and the sutlers recovered damages against him to the value of the property destroyed.

This case shows how carefully the rights of private property are guarded by the laws in England; and they are certainly not less valued nor less securely guarded under the Constitution and laws of the United States.

We think, therefore, that the instructions of the Circuit Court on the 2d and 3d points were right.

The 4th ground of objection is equally untenable. The liability of the defendant attached the moment the goods were seized, and the jury have found that the plaintiff did not afterwards resume the ownership and possession.

Indeed, we do not see any evidence in the record from which the jury could have found otherwise. From the moment they were taken possession of at San Elisario, they were under the control of Colonel Doniphan, and held subject to his order. They were no longer in the possession or control of the plaintiff, and the loss which happened was the immediate and necessary consequence of the coercion which compelled him to accompany the troops.

It is true, the plaintiff remained with his goods and took care of them, as far as he could, during the march. But whatever he did in that respect was by the orders or permission of the military authorities. He had no independent control over them.

Neither can his efforts to save them from loss, after they arrived at the town of Chihuahua, by sale or otherwise, be construed into a resumption of possession, so as to discharge the defendant from liability. He had been brought there with the property against his will; and his goods were subjected to the danger in which they were placed by the act of the defendant. And the defendant cannot discharge himself from the immediate and necessary consequences of his wrongful act, by abandoning all care and control of the property after it reached Chihuahua, and leaving the plaintiff to his own efforts to save it. He could not discharge himself without restoring the possession in a place of safety; or in a place where the plaintiff was willing to accept it. And the plaintiff constantly refused to take the risk upon himself, after they arrived at Chihuahua, as well as on the march, and warned Colonel Doniphan that he would not.

Neither can the permission given to the plaintiff to leave the troops and go to the hacienda of Parns, affect his rights. He

was then in the midst of the enemy's country, and to leave the American forces at that point might have subjected his person and property to greater dangers than he incurred by remaining with them. The plaintiff was not bound to take upon himself any of the perils which were the immediate consequences of the original wrong committed by the defendant in seizing his property and compelling him to proceed with it and accompany the troops.

The 5th point may be disposed of in a few words. If the power exercised by Colonel Doniphan had been within the limits of a discretion confided to him by law, his order would have justified the defendant even if the commander had abused his power, or acted from improper motives. But we have already said that the law did not confide to him a discretionary power over private property. Urgent necessity would alone give him the right; and the verdict finds that this necessity did not exist. Consequently the order given was an order to do an illegal act; to commit a trespass upon the property of another; and can afford no justification to the person by whom it was executed. The case of Captain Gambier, to which we have just referred, is directly in point upon this question. And upon principle, independent of the weight of judicial decision, it can never be maintained that a military officer can justify himself for doing an unlawful act, by producing the order of his superior. The order may palliate, but it cannot justify.

But in this case the defendant does not stand in the situation of an officer who merely obeys the command of his superior. For it appears that he advised the order, and volunteered to execute it, when, according to military usage, that duty more properly belonged to an officer of inferior grade.

We do not understand that any objection is taken to the jurisdiction of the Circuit Court over the matters in controversy. The trespass, it is true, was committed out of the limits of the United States. But an action might have been maintained for it in the Circuit Court for any district in which the defendant might be found, upon process against him, where the citizenship of the respective parties gave jurisdiction to a court of the United States. The subject was before this court in the case of McKenna *v.* Fisk, reported in 1 How. 241, where the decisions upon the question are referred to, and the jurisdiction in cases of this description maintained.

Upon the whole, therefore, it is the opinion of this court, that there is no error in the instructions given by the Circuit Court, and that the judgment must be affirmed with costs.

12 *

Mr. Justice DANIEL dissented.

In this case I find myself constrained to disagree with the opinion of the court just pronounced. This disagreement is not so much the result of any view taken by me of the testimony in this case, in conflict with that adopted by my brethren; for, with respect to the character of the testimony, were that the subject regularly before us, there perhaps would exist little or no difference of opinion. With some modifications, perhaps unimportant, I might have agreed also to the legal propositions laid down by the court, so far as I have been able to extract them from the charge of the judge. My disagreement with the majority, relates to a great principle lying at the foundation of all legal inquiries into matters of fact; lying indeed at the foundation of civil society itself: the preservation, in its fullest scope and integrity, unaffected, and even unapproached by improper influences, direct or indirect, of the venerable, the sacred, the unappreciable trial by jury. In the remark just made, or in any criticism which may be attempted as to the charge of the judge at circuit, in this case, I would have it understood that there is no officer to whose learning, or to whose integrity of purpose, I would with greater confidence intrust either the rights of the citizen, or the exposition of the law, than I would to the judge whose opinion is before us; but in this instance, it seems to me, that in accordance with a practice which, although it has obtained in some of the courts, is regarded as irregular and mischievous, he has stepped beyond the true limits of the judicial province. Duty demands of me, therefore, however ineffectual the effort, that I should oppose my feeble resistance to the aggression.

I object to the charge of the judge in this case, as I would to every similar charge of a court presiding over a jury trial at common law, because it is not confined to a statement of the points of law raised by the pleadings, and to the competency or relevancy of the testimony offered by either party in reference to those points; but extends to the weight and efficiency of the evidence, all admissible, and in fact admitted, and declares to the jury minutely and emphatically, what that testimony does or does not prove. And now let us examine the language of the charge. It is as follows:

" One ground on which the defence is placed is, that the plaintiff was engaged in an unlawful trade with the public enemy, and that, being engaged in an unlawful trade, his goods were liable to confiscation; and any person, particularly an officer of the army, could seize the same.

This ground, as I understand the evidence, has altogether failed. He was not only not so engaged, but was engaged in trading

Mitchell *v.* Harmony.

with that portion of the territory reduced to subjection by our arms, and where his trading with the inhabitants was permitted and encouraged. The army was directed to hold out encouragement to the traders. There is no foundation, therefore, for this branch of the defence. Another ground taken by the defendant, and relied upon, depends upon another principle of public law, viz., the taking possession of the goods at a time and place when it was necessary for the purpose of preventing them from falling into the hands of the enemy. This has been urged as particularly applicable to the plaintiff's goods, some of which consisted of articles which might be used as munitions of war, wagons for transportation, &c.

Taking the whole of the evidence together, and giving full effect to every part of it, we think this branch of the defence has also failed.

No case of peril or danger has been proved which would lay a foundation for taking possession of the goods of the plaintiff at San Elisario, on that ground, either as it respects the state of the country, or the force of the public enemy. On the contrary, it was in the possession of the arms of this government. There was no enemy, no public force at the time in the neighborhood, which put the goods in the danger of being captured. The plaintiff's goods, therefore, stood in the same condition as the goods of any other trader in the country. The testimony does not make out a case of seizure of property justified by the peril of its falling into the enemy's hands. The peril must be immediate and urgent, not contingent or remote; otherwise every citizen's property, particularly on the frontiers, would be liable to be seized or destroyed, as it must always be more or less exposed to capture by the public enemy. The principle itself, if properly applied, of the right to take property to prevent it from falling into the hands of the enemy, is undisputed. But in this case there was no immediate or impending danger, no enemy advancing to put the goods in peril. They were more exposed to marauding parties than to any public force, the danger from which the plaintiff considered himself able to take care of. The next ground of defence, and which constitutes the principal question in the case, and upon which it must probably ultimately turn, is the taking of the goods by the public authorities for public use. I admit the principle of public law; but this rests likewise upon the law of necessity. I have no doubt of the right of a military officer, in a case of extreme necessity, for the safety of the government or of the army, to take private property for the public service.

An army upon its march, in danger from the public enemy, would have a right to seize the property of the citizen, and use

it to fortify itself against assault while the danger existed and was impending, and the officer ordering the seizure would not be liable as a trespasser; the owner must look to the Government for indemnity. The safety of the country is paramount, and the rights of the individual must yield in case of extreme necessity. No doubt, upon the testimony, if the enemy had been in force, in the neighborhood of the United States troops, with the disparity which existed at Sacramento, and the same danger for the safety of the troops existed at San Elisario that threatened them there, the commanding officer might, for the safety of this army, seize and use, while the danger continued, the wagons and teams of the plaintiff that could be immediately brought into the service, to meet and overcome the impending danger. An immediate, existing, and overwhelming necessity would justify the seizure for the safety of the army.

Looking, however, at the testimony, it seems to me quite clear that these goods were seized, not on account of any impending danger at the time, or for the purpose of being used against an immediate assault of the enemy, by which the command might be endangered, but that they were seized and taken into the public service for the purpose of coöperating with the army in their expedition into the enemy's country, to Chihuahua. The mules, wagons, and goods were taken into the public service for the purpose of strengthening the army, and aiding in the accomplishment of the ulterior object of the expedition, which was the taking of Chihuahua; it was not to repel a threatened assault, or to protect the army from an impending peril; in my judgment, all the evidence taken together does not make out an immediate peril or urgent necessity existing at the time of seizure which would justify the officer in taking private property and impressing it into the public service; the evidence does not bring the case within the principle of extreme necessity; it does not make out such a case, or one coming within the principle; there is not only no evidence of an impending peril to be resisted by the public force, but the goods were taken for a different purpose, viz., for the purpose of coöperating with the army against Chihuahua; the army had to march over two hundred miles before it reached or found the enemy; the danger, if any, lay in the pursuit, not in remaining at San Elisario or returning to Santa Fé; there had been a sudden insurrection against the authority of the government in that neighborhood, but it was immediately suppressed.

As to the remaining grounds of defence, the liability of the defendant for taking the goods and appropriating them to the public service accrued at the time of the seizure; if it was an unlawful taking, the liability immediately attached, and the

question was whether that liability had been discharged or released by any subsequent act of the plaintiff; Colonel Mitchell, who executed the order, was not alone responsible, Colonel Doniphan, who gave the order, was also liable; they were jointly and severally responsible; then, was any act done by the plaintiff which waived the liability, or by which he resumed the ownership and possession of the goods? Certainly the abandonment of the goods to Colonel Doniphan cannot be regarded as an act of resumption of ownership; on the contrary, it was consistent with the assertion of his liability; there had been a negotiation between them; Colonel Doniphan advised him to sell the goods at Chihuahua and look to the government for indemnity, and, in pursuance of this, measures were taken for their protection and safe-keeping. 1 doubt if there be any evidence showing an intent on the part of the plaintiff to resume ownership over the goods as his private property after they had been seized by the army, or any act done by him that would, when properly viewed, lead to that result."

The bill of exceptions concludes as follows:

". After the judge expressed his views of the case as above stated, the counsel on both sides declined going to the jury.

The presiding judge accordingly charged the jury that the law was as had been stated by him, and that if they agreed with him in his view of the facts, that they would find for the plaintiff, otherwise for the defendant.

The counsel for the defendant did then and there except to each of the four propositions mentioned in the charge above stated.

The jury, without leaving their seats, returned a verdict for the plaintiff for $90,806.44.

And because none of the said exceptions, so offered and made to the opinions and decisions of the said associate justice, do appear upon the record of the said trial; therefore, on the prayer of the said defendant, by his said counsel, the said associate justice hath to the bill of exceptions set his seal, April term, one thousand eight hundred and fifty.    S. NELSON. [SEAL.]".

The record, above cited, informs us that after the judge had expressed his views of the case as above stated, the counsel on both sides declined going to the jury. And surely, after such an expression, no other result could well have been anticipated. In the first place, the counsel for the plaintiff could not have made to the jury so authoritative an argument in behalf of his client; and in the next place the counsel for the defendant must have been a rash man could he have attempted to throw his individual weight (whatever might have been his ability) in opposition to this authoritative declaration and influence of the court. Nay,

it may be insisted, that if the court, in passing upon the weight of the evidence, was acting within its legitimate sphere, the counsel would have been justly obnoxious to the imputation of indecorum, if not of contempt, in assailing before the jury the judge's decision; for the respective provinces of the court, the counsel, and the jury, are separate, distinct, and well defined, and neither should be subject to invasion by the other.

But after the counsel had been thus silenced, and the weight of the evidence fully and minutely pronounced upon by the court, it is insisted, that the alleged irregularity was entirely cured, by a declaration from the court to the jury, "that if they agreed with him in his view of the facts, they should find for the plaintiff, otherwise they might find for the defendant." But the natural and obvious inquiry here is, what the judge's view of the facts had to do with this matter. It was the jury who were to find the facts for the judge, and not the judge who was to find the facts for the jury; and if the verdict is either formally, or in effect, the verdict of the judge, it is neither according to truth nor common sense, the verdict of the jury; and these triers of fact had better be dispensed with, as an useless, and indeed an expensive and cumbersome formula in courts of law, than be preserved as false indicia of what they in reality do not show. Moreover, this determination of facts by the court does not place the parties upon fair and equal grounds of contest before the minds of the jury; it is placing the weight of the court, which must always be powerfully felt, on the side of one of the parties, and causing the scale necessarily to preponderate by throwing the sword, which, under such circumstances, can hardly be called the sword of justice, into one of the scales in which the rights of the parties are hanging.

The practice of passing upon the weight of the evidence and of pronouncing from the bench what that evidence does or does not prove, accords neither with the nature and objects of jury trial, as indicated by its very name, nor as affirmed by the fathers of the law who have defined this institution and proclaimed it to be the ark of safety for life, liberty, and property. Thus it is called the trial *per pais*, or by the country, to distinguish it as a determination of the rights of the subject or citizen by his fellow subjects or citizens, from a determination thereon by the action of mere officials or creatures of the government. And with respect to the peculiar intent and effects of this tribunal of the people we read thus: Justice Blackstone, speaking of this institution, says: "The trial by jury has ever been, and, I trust, ever will be, looked upon as the glory of the English law. And if it has so great an advantage over others in regulating civil property, how much must that advantage be heightened when

it is applied to criminal cases! It is the most transcendent privilege which any subject can enjoy or wish for, that he cannot be affected, either in his property, his liberty, or his person, but by the unanimous consent of twelve of his neighbors and equals." Again he says: " Great as this eulogium may seem, it is no more than this admirable constitution, when traced to its principles, will be found in sober reason to deserve. The impartial administration of justice, which secures both our persons and our property, is the great end of civil society. But if that be entirely intrusted to the magistracy, a select body of men, and those generally selected by the prince, or such as enjoy the highest offices in the state, their decisions, in spite of their own natural integrity, will have frequently an involuntary bias towards those of their own rank and dignity. It is wisely ordered, therefore, that the principles and axioms of law, which are general propositions flowing from abstracted reason, and not accommodated to times or men, should be deposited in the breasts of the judges, to be occasionally applied to such facts as come properly ascertained before them. For here partiality can have little scope : the law is well known, and is the same for all ranks and degrees; it follows as a regular conclusion from the premises of facts preëstablished. But in settling and adjusting a question of fact, when intrusted to any single magistrate, partiality and injustice have an ample field to range in, either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder." And again : " Every new tribunal erected for the decision of facts without the intervention of a jury (whether composed of justices of the peace, commissioners of the revenue, or judges of a court of conscience, or any other standing magistracy,) is a step towards establishing aristocracy, the most oppressive of absolute governments. It is, therefore, upon the whole, a duty which every man owes to his country, his friends, his posterity, and himself, to maintain, to the utmost of his power, this valuable constitution in all its rights; to restore it to its ancient dignity if at all impaired by the different value of property, or otherwise deviated from its first institution; and above all to guard it against the introduction of new and arbitrary methods of trial, which, under a variety of plausible pretences, may in time imperceptibly undermine this best preservative of English liberty."

With regard to the legitimate and proper mode of operation, and effect of the trial by jury, the language of Lord Coke should ever be kept in mind, as furnishing the true and only true standard by which to measure this valuable institution. After giving his derivation of the terms verdict and judgment,

this great common lawyer proceeds, "*Et sicut ad quæstionem juris non respondent juratores sed judices; sic ad quæstionem facti, non respondent judices sed juratores.*" For jurors are to try the fact, and the judges ought to judge according to the law that ariseth upon the fact, for *ex facto jus oritur.* The manner of stating the above propositions by this great lawyer and commentator is worthy of particular attention, as defining and illustrating with clearness and precision, the powers and duties of the court and the jury. He has not simply said, *ad quæstionem juris respondent judices*, nor in like manner *ad quæstionem facti, respondent juratores*, but he has placed them in a striking opposition and contrast, and drawn a well-defined limit around the functions of both the court and the jury, and informed them, in terms too unequivocal for misapprehension, that the limit, thus prescribed, neither has the power to transcend; has declared to each what it shall not do. Thus, literally translated, his annunciation is "And as with respect to the questions of law, the jury must not respond, but only the judges; so, or in like manner, or under like restriction, the judges must not respond to questions of fact, but only the jury." There can be no escape from the force of the positions thus laid down by Lord Coke, by the argument that the jury are not absolutely bound by the opinion pronounced by the court upon the weight of the evidence. The proper inquiry here is, not as to the absolute and binding authority of the court's opinion upon the weight of evidence, but that inquiry is, what are the legitimate and appropriate functions of the court and the jury; whether the former, in pronouncing upon the weight of the evidence, can, within any rational sense, be responding only to questions of law, or whether it is not controlling the free action of the jury by the indirect exertion of a power which all are obliged to concede that it does not legitimately possess; the power of responding to the facts of the case. This is one of the mischievous consequences against which we are assured by Justice Blackstone, that the trial by jury was designed to guard, when he remarks that, "in settling and adjusting a question of fact when intrusted to any single magistrate, partiality and injustice have an ample field to range in, either by boldly asserting that to be proved which is not so, or by more artfully suppressing some circumstances, stretching and warping others, and distinguishing away the remainder." And if this power of interpretation or of weighing the evidence cannot safely be deposited within the regular commission of the judge, much less should an attempt to wield that power be tolerated, when confessedly beyond his commission. The objection here urged to the interposition of the court as to the weight of evidence, is by

no means weakened by the excuse or explanation that such declaration by the court is not binding, but is given in the way of advice to the jury; the essence of the objection is perceived in the control and influence which an interposition by court is almost certain to produce upon the otherwise free and unembarrassed action of the jury, and the restraint it imposes upon the views and efforts of the advocate, who, in a great majority of instances, will hardly venture to throw himself openly into a conflict with the court. And again the maxim which declares that *ad quæstionem facti non respondent judices*, would seem to forbid this advice altogether, or to render it officious or irregular at least. The court can exercise a legitimate and effectual control over the verdict of juries by the award of new trials, and should be restricted to this regular exertion of its acknowledged power. Let us test this interposition by the court, by comparing it with a similar irregularity on the part of the jury. "*Ad quæstionem juris non respondent juratores sed judices*," says the maxim. Now, suppose the jury sworn in a cause should declare to the court what evidence was competent or relevant to the issues they were to try, and what, in their view, should be the law governing the contest between the parties. Would not such a proceeding be regarded as extremely irregular and wholly unjustifiable? And why would it be so regarded? Simply because in so acting the jury would transcend the province assigned them by their duty; because they would not be conforming to the maxim *ad quæstionem legis non respondent juratores sed judices.* And yet, perhaps, there would be greater color for this proceeding than can be found to excuse the interference by the court in questions of fact; for it is undeniable that from the earliest periods of the practice of jury trials, the jury, of right, could find a general verdict, thereby constituting themselves judges both of law and fact.

In accordance with the maxim quoted from Lord Coke, may be cited other authorities of great weight. Thus, in the case of Rex *v.* Poole, to be found in Cases in the King's Bench, in the time of Lord Hardwicke, it is said by Hardwicke, C. J., that "it is of the greatest consequence to the law of England, and to the subject, that the powers of the judge and the jury be kept distinct; that the judge determine the law, and the jury the fact; and if ever they come to be confounded, it will prove the confusion and destruction of the law of England." So likewise in Foster, p. 256, it is said, that "the construction of the law, upon the facts found by the jury, is in all cases undoubtedly the proper province of the court." It has been said, that the course pursued by the judge in this case is in conformity with the practice of the courts of England, and in the

majority of the States of this Union. For the establishment of the position assumed, either with regard to the English courts, or with respect to the tribunals of the several States, no authorities have been cited; but, even if this position should be conceded, it is not the less clear that the rule it is invoked to sustain is a flagrant departure from the great principle so emphatically asserted by the fathers of the law, and should not the less be viewed and shunned as an abuse rather than an example worthy of imitation. In what number of States of this confederacy such a practice (such an abuse, as I would term it,) may prevail has not been shown; certain it is, that in many of the Southern States it does not obtain, and would not be tolerated. It has also been said, that the right of the judge to instruct the jury upon the weight of testimony has been ruled as the established doctrine of this court. If this be so, it is a revelation which the friends of jury trial, in its full integrity and independence, will grieve to learn, and will be disposed to regard as a demolition by this court of that sacred ark of civil liberty, for which by the greatest services it may render, it can hardly ever be able to atone. It is true that, in the case of Carver v. Jackson, 4 Pet. 80, there is an expression of Mr. Justice Story, in delivering the opinion of the court, broad enough to cover this irregular exercise of power by the court in its widest extent. But, upon examination, it will be seen that this expression had no real connection with the points regularly before the court, and, as a mere dictum, was entirely without authority. In the introductory part of his opinion, Mr. Justice Story, meaning merely to express his disapprobation of a practice of bringing up for review the entire charge of the court below, without stating specific points or grounds of exception, as extremely inconvenient, takes occasion to use the following remark, namely, — that, "with the charge of the court to the jury upon mere matters of fact, and with its commentaries upon the weight of evidence, this court has nothing to do." But it is remarkable that this judge goes on to say, with respect to these commentaries, that they are of no binding legal effect; thus, in reality, pronouncing their condemnation in the same breath which sanctions their admission to affect, if it can be done without legal or binding obligation, the minds of the jurors. Surely it may be assumed as a postulate, that a court of justice, in adjudicating upon the rights of the citizen or of the State, should do, and can have power to do, nothing which is irregular, or vain, or useless. Its duty and its office is to do the law, and nothing but the law. The anomalous and contradictory doctrine above noticed has, I think, been condemned by a more recent and a far more correct decision of this court; a decision

directly in point upon this subject, — I allude to the case of Hanson *v.* Eustace; 2 How. 706. In that case, the late Justice Baldwin, under the rule which admits of secondary evidence when the primary evidence is not within the power of a party, or is withheld improperly by his adversary, went so far beyond the just application of the rule as to say to the jury what the secondary or presumptive evidence did actually prove; but still accompanied his declaration with the salvo, " that if they agreed with him in opinion." This is his language: " Should your opinion agree with ours on this point, you will presume that there was a deed from Robert Phillips, or his heirs, competent to vest the title to the sixth street lot in the firm of Robert & Isaac Phillips; that it so remained at the time of the assignment, and that it was by such conveyance as would enable them to enjoy the property against Robert Phillips and his heirs." And this court reversed the decision of the Circuit Court, upon the ground that the judge's charge declared to the jury what their conclusions, from the secondary evidence, ought specifically to be. This decision I regard as in strict conformity with the doctrines promulged by the fathers of the law, the doctrine which alone can prevent the inestimable trial by jury from becoming a mere mockery and a deception to those who have been taught to revere and rely upon it as the best safeguard of these rights. Transforming this institution from what it was intended to be, and once was in reality, — a trial by the country, — into a mere formula, to be moulded at the discretion of the court. I think that the judgment of the Circuit Court should be reversed.

David D. Mitchell, Plaintiff in Error, *v.* Manuel X. Harmony. ⎱ In obedience to the order of the court in this case, yesterday, the clerk of this court having filed the following report, namely: —

*Supreme Court of the United States. No. 178. December Term,* 1851.

David D. Mitchell, Plaintiff in Error, *v.* Manuel X. Harmony. ⎱ In error, to the Circuit Court of the United States for the Southern District of New York.

In calculating the interest on the judgment of affirmance in the above-entitled cause, the clerk respectfully presents, at the instance of the respective counsel, the following different modes for the consideration of the court: —

1. Interest, at the rate of six per cent., on the judgment of the Circuit Court, from the 9th November, 1850, the day the judgment was signed, to this date.

2. Interest, from the 1st April, 1850, the first day of the term at which the judgment was rendered, to this date.

3. Interest, at the rate of 7 per cent., from 9th November, 1850, to 26th February, 1851, (the date of the writ of error,) and then at 6 per cent. on the aggregate, to this date.

4. Interest, at the rate of 7 per cent., from 1st April, 1850, to 26th February, 1851, and then at 6 per cent. on the aggregate, to this date.

The clerk feels bound to confine his calculations to the 18th rule of the court, irrespective of the act of Congress of 23d August, 1842.　　　　WM. THOMAS CARROLL, C. S. C. U. S.
14th May, 1852.

### Calculation No. 1.

$95,855.38　Judgment of Circuit Court, U. S., for New York, signed 9th November, 1850.

　8,706.85　Interest, at 6 per cent. per annum, from 9th November, 1850, to 14th May, 1852, — one year,
―――――――
$104,562.23　six months, and five days.

### Calculation No. 2.

$95,855.38　Judgment of Circuit Court, U. S., for New York, rendered 1st April, 1850.

12,204.57　Interest, at 6 per cent. per annum, from 1st April,
―――――――　1850, to 14th May, 1852, — two years, one
$108,059.95½　month, and fourteen days.

### Calculation No. 3.

$95,855.38　Judgment of Circuit Court, U. S., for New York, signed 9th November, 1850.

1,994.35　Interest, at 7 per cent. per annum, from 9th November, 1850, to 26th February, 1851, — three
―――――――
97,849.73　months and seventeen days.

7,139.51　Interest on this amount at 6 per cent. per annum,
―――――――　from 26th February, 1851, to 14th May, 1852,
$104,989.24　— one year, two months, and eighteen days.

### Calculation No. 4.

$95,855.38　Judgment of Circuit Court, U. S., for New York, rendered 1st April, 1850.

6,076.15　Interest, at 7 per cent. per annum, from 1st April,
―――――――　1850, to 26th February, 1851, — ten months
$101,931.53　and twenty-six days.

7,440.99　Interest on this amount, at 6 per cent. per annum,
―――――――　from 26th February, 1851, to 14th May, 1852,
$109,372.52　— one year, two months, and eighteen days.

And *Mr. Vinton* having filed the following exceptions, namely : —

The defendant in error, M. X. Harmony, excepts to the report of the clerk, touching the computation of interest on the above-named judgment of the Circuit Court, U. S., for the Southern District of New York, in this, namely : —

1st. That, by the act of Congress of the 23d of August, 1842, the said defendant in error is entitled to the same rate of interest on said judgment (being 7 per cent.) as he would be entitled to if said judgment had been rendered in a State court of the State of New York; whereas, the said computation allows 6 per cent. only on said judgment. See 5 *Statutes at Large*, 518.

2d. That the said interest ought to be computed, on said judgment, from the 1st Monday in April, 1850, instead of from the 9th of November of that year. See printed record, pages 19 and 20.                          S. F. VINTON,
   May 14, 1852.                     *For Defendant in Error.*

And the said defendant in error, also, at the same time, moves the court to open up the judgment of affirmance (rendered in this court at its present term) of said judgment of said Circuit Court, touching the damages allowed in said judgment of affirmance; and in lieu of 6 per cent. per annum, therein given on said judgment below, to allow 7 per cent. per annum therein, to be computed from the      day of           1850, in conformity to said act of Congress, of the 23d of August, 1842.                                    S. F. VINTON,
                                     *For Defendant in Error.*

It is thereupon now here ordered by the court, that the said report and exceptions be set down for argument next Monday, the 17th instant.

The court declined to hear any argument on the motion of *Mr. Vinton,* and the exceptions filed by him to the clerk's report, and took the same under advisement.

On consideration of the motion made by Mr. Attorney-General Crittenden, on the 13th instant; of the report by the clerk, filed the 14th instant; of the exceptions to said report, by Mr. Vinton, filed the same instant; and of the motion filed by Mr. Vinton, the 15th instant, it is the opinion of the court, that the first calculation by the clerk in his report is the proper mode of calculating the damages given under the rule of court. Wherefore, it is now here ordered by the court, that the judgment entered in this case, on the 12th instant, do stand as the judgment of this court.

13*

### *Order.*

.This cause came on to be heard on the transcript of the record from the Circuit Court of the United States, for the Southern District of New York, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs and damages, at the rate of six per centum per annum.