Davis, J.,
delivered the opinion of the court:
These cases were tried during the last term; judgments were entered in favor of plaintiffs and appeals were taken to the Supreme Court. That court, affirming the decision of this *195 court upon the other points of law discussed, reverse the cases and send them back for the reason:
“As it appears from the findings of the Court of Claims that plaintiffs’ animals were often used to aid in hauling Government trains, and thus did extra work on insufficient food,’ there is perhaps ground for a recovery to some extent under the terms of the act for property taken and impressed into the service of the United States, but we are unable from the findings to determine the amount properly allowable on that account. It becomes necessary, therefore, to reverse the judgments in both cases, and remand them to the Court of Claims for more definite and specific findings; and inasmuch as we have determined that the facts as found by the Court of Claims in the present record do not enable us to determine what property of the plaintiffs was taken and impressed into the service of the United States by Colonel Johnston the cases may be opened for further proofs oh that point. The judgments are therefore reversed, and the causes remanded to the Court of Claims for further proceedings in accordance with this opinion.” (127 U. S. R., 125.)
The order of the Supreme Court has been complied with; the cases have been again tried, and the findings made more explicit and full as to the property “ taken and impressed into the service of the United States.” The act of Congress sending these cases here also embraces “ property alleged to have been sold to the Government,” but it is not contended that any of the property (the subject of this litigation) was sold to the Government.
It appears from the findings that plaintiffs were not only prevented from proceeding to their destination but were not allowed to leave the Army column. They desired to remain at South Pass, or to return east, or to diverge from the line of march to obtain better pasturage for tbeir animals, but were refused all liberty of action and were strictly held to the military column.
This action of Colonel Johnston appears to have been a reasonable and prop'er exercise of military authority; by it he obtained control of the trains which might have fallen into the hands of the Mormons if they had been allowed to quit the column, and held at hand stores which might become necessary to him, and which, in fact, after his arrival at Fort Bridger, he used.
■ “ It by no means follows from that alone,” say the Supreme Court,” that their [the plaintiffs’] property was taken and im *196 pressed into the service of the United States in the sense of the act of Congress of July 8, 1886. * * * To require the plaintiffs’ trains to remain with the military force, in order to insure the success of the expedition by preventing the enemy from obtaining information and supplies, can not be construed as a seizure and impressment of their property into the public service.”
The primary object of stopping the trains was to prevent their falling into the hands of the Mormons. Probably Colonel Johnston feared that, even if left at Eocky Eidge or South Pass, or allowed to return east, or to wander from the protecting military column, these trains might have suffered the fate of other trains, and have been confiscated or destroyed by the Mormons. It was a great hardship to the freighters to be detained as they were, and their severe losses are directly attributable to the military control. On the other hand, Colonel Johnston exercised with reasonable discretion a power properly lodged in him as commander of a military expedition opposed by a hostile force. One of his most important duties was to prevent the supplies and information from reaching his enemy. An exercise of this power alone is not a seizure or im-pressment into the service of the United States, and for the losses resulting therefrom there can be no recovery in law, however great the suffering of the innocent individual.
On the road to Fort Bridger, and owing to the military control, the freighter»’ stock suffered greatly and many died, overcome by cold, by fatigue, and by insufficient food. This loss would not have occurred had the trains been allowed to proceed to their destination, to return east, or to remain in camp in the neighborhood where they were found by Colonel John: ston’s column. Separated from the Army column, free to move as they liked, to seek shelter and to graze upon a larger area, the stock could have been kept substantially unimpaired in number and strength.
As to this loss, the Supreme Court have said :
“Even if it be a just inference of fact that the plaintiff's were under compulsion in keeping with the column of Colonel Johnston, it by no means follows from that alone that their property was taken and impressed into the service of the United States in the sense of the act of Congress of July 8, 1886. However proper it might have been for the legislature to have provided indemnity for the losses occurring by reason simply of the detention thus occasioned, we can not think it was *197 the intention of the act to go beyond the payment for property actually used and employed by the Government in its .service. To require the plaintiffs’ trains to remain with the military force, in order to insure the success of the expedition, by preventing the enemy from obtaining information and supplies, can not be construed as a seizure and impressment of their property into the public service.”
There does not appear to have been any appropriation of plaintiffs’ property until arrival at Fort Bridger. Their cattle were occasionally yoked to the Government wagons, but this use of them seems to have been accidental and incidental to a mixture of the herds in grazing; nor is it shown to have had any material effect upon the result. The direct causes of the losses on the road were the hardships incident to the military order, the delay and march in column under strict discipline. This fatigued the cattle, delayed the trains until cold weather set in, deprived the animals of shelter and of sufficient food.
Under the rule prescribed by the Supreme Court, which we have already quoted, there was no “seizure” or “impressment’^ of these trains within the meaning of the act of Congress prior to the arrival of the column at Fort Bridger, and the plaintiffs therefore can not recover for the losses sustained by them on the road to that fort from Rooky Ridge. There can, then, be no allowance for stock lost on the march, for wagons abandoned on the road, for deterioration of stock due to the hardships of the march, or for extra expense occasioned by delay. All these items of loss arose from the order forcing the trains into column, an order intended to prevent the Mormons from receiving information or supplies, and were not caused by anything which occurred at Fort Bridger.
After arrival at Fort Bridger the commissary bought plaintiffs’ cattle, paying to the Perrys the full value thereof, but paying the Irwins less than their value, because of deterioration on the march.
The Army also appropriated plaintiffs’ wagons with their outfits, and put them to Army use; this was a “seizure or im-pressment” within the meaning of the statute, and for this plaintiffs may recover.
Judgment for J. C. Irwin & Co. in the sum of $9,735.
Judgment for Charles A. Perry & Co. in the sum of $5,320.