**FRANCO–ITALIAN PACKING CO.**

v.

**The UNITED STATES.**

No. 50268.

United States Court of Claims.

Feb. 8, 1955.

Bolling R. Powell, Jr., Washington, D. C., for plaintiff.

Thomas H. McGrail, Washington, D. C., with whom was Asst. Atty. Gen., Warren E. Burger, for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and LARAMORE, Judges.

LARAMORE, Judge.

The plaintiff is seeking compensation for an alleged temporary taking by the defendant of certain of plaintiff's property shortly after the December 7, 1941, attack on Pearl Harbor. The theory of plaintiff's claim is that various incidents of interference in plaintiff's use of its property amounted to a compensable taking under the fifth amendment to the Constitution. It is defendant's position that any acts of interference to plaintiff's property rights which occurred were only the consequential result of valid sovereign acts of control and regulation and, therefore, not encompassed by the fifth amendment.

A summary of the facts is as follows: During the pertinent period of time involved in this case, October 1, 1941, to February 15, 1942, plaintiff was engaged in the business of catching, processing, and canning fish. Two of the vessels owned by plaintiff were named the *Santa Margarita* and the *Sea Boy*, both of which were ocean-going tuna clippers of United States registry and with crews of 12 men.

In December 1941, the *Santa Margarita* and the *Sea Boy* were fishing for tuna in the Pacific Ocean off the coast of Costa Rica.

During the night of December 7, 1941, the military and naval commanders in charge of the defense of the Panama Canal were advised from Washington, D. C., of the extent of the naval disaster

caused by the Japanese attack occurring the previous afternoon at Pearl Harbor. These commanders became of the opinion that the next Japanese attack would probably be on the Panama Canal; and they were aware of the disastrous effect such attack would have on the defense of the United States at that time.

Under these circumstances, the United States Navy proceeded to obtain absolute domain over the western approaches to the Panama Canal in order that the presence of any unknown or unidentified, and therefore presumably hostile, forces could be detected and immediate attacks against them be launched. Immediately on declaration of war, the jurisdiction of the 15th Naval District was extended from the Panama Canal Zone and its immediate adjacent waters to an area extending 1,000 miles in all directions and the whole area was named the Panama Sea Frontier.

In the afternoon of December 7, 1941, immediately upon the receipt of information concerning the Japanese attack on Pearl Harbor, a naval scouting force consisting of the gunboat *Erie* and several destroyers, under the command of Comdr. Andrew R. Mack, Commander, Offshore Patrol, was ordered to sea from Balboa, Panama Canal Zone, to patrol the western approaches to the Canal, and to engage any enemy forces which might be encountered. As were his superior officers, Commander Mack was apprehensive of the possibility of a sneak attack being made on the Panama Canal similar to the one made on Pearl Harbor. His orders from the Commandant, 15th Naval District, contained no mention of boarding or seizing of vessels, but from years of training he assumed he had such right in time of war.

Commander Mack was directly in command of the gunboat *Erie*. Upon leaving Balboa, he began to intercept radio messages transmitted in secret code. He presumed that they came from tuna clippers, as his direction finder indicated their source to be an area which he knew to be a favorite fishing ground of tuna vessels. It was common practice for companion fishing vessels to signal each other when large schools of tuna were located, and the use of code messages forestalled competitive vessels from coming to the location. The radio messages would have been for any purpose of mutual interest or information between ships of a particular fleet.

It was general knowledge and Commander Mack well knew that Japanese nationals were serving in the crews of the tuna vessels. It was reasonable for Commander Mack to regard the fishing vessels with suspicion. Their secret messeages were confusing to United States naval forces, and there was the distinct possibility that any one of the vessels was transmitting information to Japanese forces.

Commander Mack further realized that loyal Americans among the fishing crews could be captured and coerced into providing military information to the enemy, and also that the fishing vessels could be seized, and their fuel oil and other supplies used by Japanese submarines.

These factors, existing only a few days after Pearl Harbor, when the extent and direction of the Japanese activity in the Pacific was still unknown, caused Commander Mack to conclude that the presence of the fishing vessels in the area constituted a serious threat to the security of the Panama Canal, and in his capacity as commanding officer of the Offshore Patrol, he determined to take affirmative action with regard to the tuna clippers.

He commenced a program of merely searching the vessels at sea, but found such a procedure was not only impractical, but dangerous. A thorough search could not be conducted, and while a limited search was progressing, the gunboat *Erie* was required to lie at rest in waters presumed to contain Japanese submarines. The Commander justifiably doubted that fishing vessels would return to their home ports, even though requested to do so, and he finally concluded that all fishing vessels would have to be seized or escorted into Balboa, the closest American port, in order that their de-

parture from the defense areas would be assured, and so that they could be carefully searched for contraband electronic gear and code books, have their radios sealed, and their crews interrogated.

About 5:15 in the morning of December 10, 1941, the *Erie* came upon the *Santa Margarita*. The fishing vessel proceeded to leave the fishing ground at full speed. The *Erie* dispatched an airplane which gave the usual signal to turn back, a dipping of the plane and starting out in the direction in which the fleeing ship was to proceed. Upon the failure of the *Santa Margarita* to follow this well-known naval instruction, the pilot of the airplane burst a shot across her bow and stopped her flight.

Upon orders of Commander Mack, Lieutenant Commander Sweeny boarded the tuna clipper with a detachment of marines and examined the vessel, its papers and crew. The captain of the *Santa Margarita* was directed to cease fishing operations and proceed immediately to the port of Puntarenas, Costa Rica, and await further orders. Lieutenant Commander Sweeny wrote the following entry in the log of the *Santa Margarita:*

"The O. S. *Santa Margarita* has this day been visited by me at 5:15 a. m. December 10 by direction of Commander A. R. Mack, U. S. Navy. I have examined the ship's papers concerning the vessel and her cargo, produced by the Master which was found by me to be regular and to show that the voyage of the vessel is lawful. The circumstances have been reported to the said Comdr. A. R. Mack, U. S. N., who has directed that the vessel be directed to proceed to Puntarenas, Costa Rica at best speed.

"The vessel is accordingly directed to proceed to Puntarenas by direction of the said Comdr. A. R. Mack."

The *Santa Margarita* proceeded to Puntarenas, remaining anchored there from December 10 to December 26, 1941, where she was convoyed with eight other fishing vessels by a United States destroyer to Balboa, Panama Canal Zone, arriving there December 29, 1941.

On the the morning of December 14, 1941, the *Erie* came upon the *Sea Boy*. Lieutenant Commander Sweeny also boarded this ship with a detachment of marines, and examined the vessel, its papers and crew. One Japanese national found aboard was removed to the *Erie*. Lieutenant Commander Sweeny made the following entry in the vessel's log:

"December 14, 1941. The Oil Screw 'Sea Boy' has this day been visited by me at 0937 by direction of Commander AR Mack, US Navy. I have examined the ships papers concerning the vessel & her cargo, produced by the master, which were found by me to be in order. There was one Japanese subject on board Malsuuki, Kinichin, Seaman. The circumstances have been reported to the said Comdr. AR Mack who has directed that the vessel be seized (and the Japanese subject be taken off). The vessel is accordingly seized and will be sent into port for adjudication."

The captain of the *Sea Boy* was advised that his vessel was seized and that he was relieved of his command. Commander Mack then placed a marine detachment, under the command of Capt. James Wilbur, in charge of the vessel to be taken to Balboa. Captain Wilbur made the following entry in the vessel's log:

"14 December 1941 1200+5 Time. By direction of commander A. R. Mack, Commanding U. S. S. *Erie* the M. S. *Sea Boy*, U. S. Registry Tuna boat of San Pedro California has this date been seized on instructions of the Commandant, 15 Naval District, and has been placed under my charge as prize master with directions to a United States Port for adjudication the Officers and Crew of the prize crew are as follows, namely, Capt. James T. Wilbur, U. S. M. C. prize master, Sgt. Charles W. Thomas, U. S. M. C. prize mate,

James M. Gentry S 1/c U. S. N. signal man, Rogert K. Childres pvt U. S. M. C. George V. Lloyd F. M. 1/c U. S. M. C. Benjamin F. Veter pvt USMC, Robert A. Glaccum pfc U. S. M. C., Henry R. Hundley pvt USMC, and Stephen W. Pate pvt U. S. M. C."

The *Sea Boy* was taken to Balboa by Captain Wilbur and his crew, arriving on December 16, 1941.

The *Sea Boy* and *Santa Margarita* were not seized or ordered into port for use by the United States, but the action was taken entirely as a defensive measure arising from the exercise of judgment by an officer charged by the United States with the direct duty of defending the western approaches to the Panama Canal from enemy attack.

Prior to either his seizure of the *Sea Boy* or his ordering the *Santa Margarita* into port, Commander Mack received no orders to the effect that fishing vessels should be cleared from the offshore waters in the interest of the security and defense of the United States.

On December 14, 1941, Commander Mack received orders from the Commandant, Panama Sea Frontier, to regard fishing vessels and similar craft in offshore water with suspicion, and to search, sink or seize them as justified.

On December 18, 1941, Commander Mack conferred with Admiral Sadler, Commandant, Panama Sea Frontier, who decided and verbally ordered that all fishing operations in the western approaches to the Panama Canal were to be terminated and that all remaining fishing vessels would be brought into Balboa to be inspected and searched and to have their crews interrogated. This order was executed by Commander Mack and his Offshore Patrol.

Admiral Sadler's order was not made nor executed for the purpose of acquiring vessels for the use of the United States.

When the fishing vessels, including the *Santa Margarita* and *Sea Boy,* were brought or came into Balboa, they were placed in the custody of Commander Waite, the Port Director. By about December 18, 1941, there were as many as 30 to 35 tuna vessels in Balboa Harbor. Some of them had voluntarily come into port at the outbreak of war.

During the latter part of December 1941 the Navy decided to requisition some of the fishing vessels. After conversion, they were used as patrol craft and refrigerated supply ships off the Panama Canal Zone. Neither the *Sea Boy* nor the *Santa Margarita* were among the vessels requisitioned.

The *Sea Boy* arrived at Balboa Harbor on December 16, 1941. En route after seizure, the marine detachment was fed from the plaintiff's stock of food supplies, and the plaintiff's fuel oil was used to operate the vessel until the fuel was replenished by the Navy at Puerto Armuelles, Panama, on the way to Balboa. Upon arrival at Balboa, the marine detachment was removed, and the *Sea Boy* was placed in the custody of Commander Waite, the Port Director.

The captain of the *Sea Boy* was taken to Commander Waite who told him that he would be later advised as to what he was to do, and sent him back to the vessel. The *Sea Boy* remained at Balboa for four days. During that time, Commander Waite met informally with the various sea captains on the docks each morning. The captain of the *Sea Boy* testified that Commander Waite stated that there was no need to worry about the spoiling of the fish in the ships because the owners would be paid for a full load of fish, that the boats would be used for Government purposes, and that the crews would be taken to home port by the Navy.

There is no showing that Commander Waite had any authority to represent what the United States would do about compensation for fish, or to determine or state what use, if any, would be made of the vessels by the United States Navy, or anyone else.

On December 20, 1941, an unidentified Navy officer called together a number of

the captains of fishing vessels, gave them instructions that they were to leave Balboa Harbor with their ships, and return to San Pedro, California, advised them to stay within designated areas to avoid mines and action by patrol craft, and issued them sealed orders to be opened at sea. The sealed orders were to be delivered to the United States Navy upon arrival.

The *Sea Boy* departed that day, and arrived at San Pedro, California, on January 3, 1942. After delivery of the papers to the Navy, the plaintiff's captain was told by a Navy yeoman that he was free to take the vessel which was then delivered to the plaintiff's dock for unloading.

Upon the arrival of the *Santa Margarita* at Balboa on December 29, 1941, her captain was taken to Commander Waite who told him to keep the vessel in port until further orders. The next day the Port Director inquired as to the amount of fish on the *Santa Margarita*, and thereupon directed the plaintiff's captain to take fish from two other fishing vessels to make up a full load to return to San Pedro. The captain complied and transferred into his vessel 69 tons of fish belonging to the Van Camp Sea Food Company. The Port Director told the captain of the *Santa Margarita* that the Government would pay compensation on the basis of a full load of fish.

Upon completion of the loading on January 4, 1942, the captain was ordered to take the *Santa Margarita* directly to San Pedro, California, under blackout, arriving there on January 18, 1942. Upon unloading, the 69 tons of fish taken aboard at Balboa were delivered to the Van Camp Sea Food Company.

By Executive Order 8970, dated December 11, 1941, 6 F.R. 6417, the territorial waters at and about San Pedro, California, and various coastal waters were established as naval defensive sea areas. It was provided as follows:

"A vessel not proceeding under United States naval or other United States authorized supervision shall not enter or navigate the waters of any of the defensive sea areas established hereby except during daylight, when good visibility conditions prevail, and then only after specific permission has been obtained. Advance arrangements for entry into or navigation through or within any of the said defensive sea areas must be made, preferably by application at the appropriate United States Naval District Headquarters in advance of sailing, or by radio or visual communication on approaching the seaward limits of the area."

Upon the arrival of the *Sea Boy* and the *Santa Margarita* at San Pedro on January 3, and 18, respectively, the plaintiff began normal preparations for the return of the vessels to sea.

The question presented is whether the actions of the U. S. naval officers shortly after Pearl Harbor in preventing plaintiff's ships from continuing fishing operations in Pacific Ocean areas west of the Panama Canal amounted to an appropriation of plaintiff's ships which is compensable under the fifth amendment to the Constitution.

■■ The taking clause of the fifth amendment [1] is only a limitation on the exercise of a preexisting power. The defendant, as the sovereign, possesses the power of eminent domain; *i. e.*, the power to take property for private use without the owner's consent. This is an inherent power requiring no constitutional recognition. United States v. Jones, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015; United States v. Carmack, 329 U.S. 230, 241, 67 S.Ct. 252, 91 L.Ed. 209. The exercise of defendant's regulatory and police powers, war powers or emergency powers in cases of imminent peril to the general welfare do not fall within the fifth amendment limitation, although taking of private property often resulted.

[1] "[N]or shall private property be taken for public use, without just compensation." U. S. Constitution, Amendment V.

Miller v. United States, 11 Wall. 268, 20 L.Ed. 135; Juragua Iron Co., Ltd. v. United States, 212 U.S. 297, 29 S.Ct. 385, 53 L.Ed. 520; United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131; Omnia Commercial Company v. United States, 261 U.S. 502, 43 S. Ct. 437, 67 L.Ed. 773; Graham v. United States, 2 Ct.Cl. 327.

■■ The distinction between an exercise of the eminent domain power that is compensable under the fifth amendment and an exercise of the police power is that in a compensable exercise of the eminent domain power, a property interest is taken from the owner and applied to the public use because the use of such property is beneficial to the public and in the exercise of the police power, the owner's property interest is restricted or infringed upon because his continued use of the property is or would otherwise be injurious to the public welfare. 1 Nicholas, Eminent Domain, § 1.42(2) (3d Ed. 1950). This does not mean, however, that the taking of property plus the applying of it to the public use in itself is to be a compensable taking under the fifth amendment. This is obvious from the noncompensated cases [2] wherein taxation constitutes a taking of property as does the imposition of fines or forfeitures and the property taken is put to public use.

■ The control exercised by the U. S. Navy over plaintiff's fishing ships was an exercise of sovereign powers not constituting an appropriation of plaintiff's property for public use.

The evidence conclusively shows that the *Sea Boy* and *Santa Margarita* were not seized or ordered into port for use by the United States, but the action was taken entirely as a defensive measure arising from the exercise of judgment by an officer charged by the United States with the direct duty of defending the western approaches to the Panama Canal from enemy attack.

■ That the commander of the *Erie* was justified in taking the action he did is best evidenced by the sneak attack on Pearl Harbor plus interception of code messages from the fishing fleet and the very important fact that several Japanese naval officers were removed from certain vessels and one Japanese national was taken from the *Sea Boy*. The actions of defendant's naval officers in interrupting the fishing operations of plaintiff's ships, directing them into port, and finally directing them to leave the Panama Sea Frontier, were clearly emergency actions demanded by the circumstances taken in the national defense, and were completely unrelated to a direct appropriation of plaintiff's property for public use. The interference in plaintiff's use of its ships as well as the interference in the use of all other owners whose ships happened to be within the Pacific Sea Frontier at the time was an indirect result of valid actions by the sovereign for which no compensation may be paid. Legal Tender Cases, 12 Wall. 457, 551, 20 L.Ed. 287; Omnia Commercial Company v. United States, supra; New Orleans Public Service, Inc., v. City of New Orleans, 281 U.S. 682, 687, 50 S.Ct. 449, 74 L.Ed. 1115; Joseph C. Irwin & Co. v. United States, 24 Ct.Cl. 187; United States v. Irwin, 127 U.S. 125, 8 S.Ct. 1033, 32 L.Ed. 99; Graham v. United States, supra; United States v. Carver, 278 U.S. 294, 49 S.Ct. 100, 73 L.Ed. 387.

The Supreme Court in United States v. Pacific Railroad, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634, established the rule that the sovereign is immune from liability for confiscation of private property taken by defendant, through destruction *or otherwise,* to prevent it from falling into enemy hands, or to protect the health of troops, *or as an incidental element of defense against hostile attack* and is not compensable under the fifth amendment.

2. Houck v. Little River Drainage District, 239 U.S. 254, 264–265, 36 S.Ct. 58, 60 L.Ed. 266; General Motors Acceptance Corporation v. United States, 286 U.S. 49, 52 S.Ct. 468, 76 L.Ed. 971.

The principles underlying the immunity that is the sovereign's in respect to the taking of private property as the consequences of military measures were set forth as follows in United States v. Pacific Railroad, supra:

"The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the [Civil] war, had to be borne by the sufferers alone, as one of its consequences. Whatever would embarrass or impede the advance of the enemy * * * were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this. The safety of the state in such cases overrides all considerations of private loss. *Salus populi* is then, in truth, *suprema lex.* [120 U.S. at page 234, 7 S.Ct. at page 493.] * *

"The principle that, for injuries to or destruction of private property in necessary military operations during the civil war, the government is not responsible, is thus considered established. Compensation has been made in several such cases, it is true; but it has generally been * * * 'a matter of bounty rather than of strict legal right.' [120 U.S. at page 239, 7 S.Ct. at page 495.]

" * * * the government cannot be charged for injuries to, or destruction of, private property caused by military operations of armies in the field, or measures taken for their safety and efficiency * * *." [120

U.S. at page 239, 7 S.Ct. at page 496.]

The Supreme Court reaffirmed these principles of the Pacific Railroad case in its decision in Caltex (Philippines), Inc. v. United States, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157; Juragua Iron Co. v. United States, supra.

■ In a recent case this court has specifically held that consequential losses resulting from the exercise of a sovereign military power are not compensable. Aleutian Livestock Company, Inc. v. United States, 96 F.Supp. 626, 119 Ct.Cl. 326, certiorari denied 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 658.

The plaintiff claims its losses for the period from the time the *Santa Margarita* and the *Sea Boy* were boarded and directed into port by Navy officers until the time they reached their home port of San Pedro, California, amounting to $22,594.59 and consisting of the following: (1) loss resulting from plaintiff's inability to use the ships for fishing purposes, computed at a bareboat charter rate; (2) value of fish and live bait allegedly destroyed or jettisoned as the result of the termination of fishing operations; (3) value of fuel oil, galley supplies, and ice consumed during the period; and (4) salaries paid cooks and radio operators aboard the ships.

■ None of the property listed above as having been lost to plaintiff was taken physically by naval officers.[3] These losses resulted simply from the action of the Navy in prohibiting fishing in the approaches to the Panama Canal, ordering fishing ships to leave the fishing areas, and finally by ordering the ships from the western Pacific areas back to

3. There is an exception here in that the marine detachment which went aboard the Sea Boy on Sunday, December 14, to insure the ship's movement into port, and withdrew two days later on Tuesday, apparently was supplied with meals by the crew of the ship in the value of $79.65. This is the only physical use by defendant's personnel of property of the plaintiff. It was more than offset by facilities and service made available by

the United States Navy for plaintiff's ships during the period of time in issue. It was the consequential result of the naval action required at the time, as were the other losses allegedly experienced by plaintiff, and discussed above. The plaintiff makes no issue of the item other than to contend it illustrates a "seizure" of its ships, and plaintiff makes no separate claim for the sum of $79.65.

their home ports. The loss of fishing profits for the fish plaintiff could not catch was an incidence of the naval action. The expenses of the supplies and other equipment used in leaving the fishing areas as ordered and the accidental spoilage of fish and destruction of bait were all consequential results of the naval actions and was not a taking which would be compensable under the fifth amendment. Joseph C. Irwin & Co. v. United States (Perry v. United States), 24 Ct.Cl. 187.

Plaintiff also seeks to establish an appropriation of its ships on the basis of certain statements allegedly made by a Commander Waite of the Navy, who was Port Director at Balboa Harbor, into which plaintiff's ships were ordered. There is no showing that Commander Waite had any authority to represent what the United States would do about compensation for fish or to determine or state what use, if any, would be made of the vessels by the United States Navy or any one else. The ships at the time were in Balboa Harbor because they were not allowed in the Panama Canal sea area and were waiting to return to San Pedro. Commander Waite was Port Director and as such his duties consisted simply of controlling the harbor traffic. He had no authority to take plaintiff's ships for public use and had Commander Waite in fact attempted to accomplish such a taking, his attempts would have been ineffective. United States v. North American Transportation and Trading Company, 253 U.S. 330, 40 S.Ct. 518, 64 L.Ed.

935; Caltex (Philippines), Inc. v. United States, Ct.Cl., 122 F.Supp. 830. Furthermore, even if Commander Waite had had such authority, there still would not have been an appropriation of plaintiff's ships. His statements were, at the most, statements of prospective actions. It has been established that a mere declaration of an intention to take, or even a threat to take, cannot constitute a taking under the fifth amendment. United States v. Carver, 278 U.S. 294, 49 S.Ct. 100, 73 L.Ed. 387; Marion & Rye Valley Railway Company v. United States, 60 Ct.Cl. 230. Commander Waite's actions did not constitute a taking, he was not authorized to take plaintiff's property, and there was no subsequent ratification by his superiors confirming an exercise of proprietary interest. Therefore, such statements by Commander Waite, if they were made, do not establish a taking of plaintiff's property.[4]

The record conclusively establishes that plaintiff's property was not appropriated by the defendant for public use, that plaintiff was not deprived of any property by the defendant within the compass of the fifth amendment, and that any of the alleged losses plaintiff may have experienced were the indirect consequences of naval operations for which the defendant is not liable. Therefore, the petition is dismissed.

It is so ordered.

JONES, Chief Judge, and MADDEN, WHITAKER and LITTLETON, Judges, concur.

---

4. The action of Port Director Waite in directing the captain of the Santa Margarita to take fish from two other fishing vessels to make up a full load to return to San Pedro, was not a taking of plaintiff's ship. Furthermore, plaintiff suffered no losses for this service to another San Pedro fishing company, alleges none, and makes no claim in its brief for the service if it be such. In fact, it would seem plaintiff was benefited by the acceptance of a full load. Plaintiff's other ship, the Sea Boy, shipped back to San Pedro with one of its storage boxes only one-third full and the resulting shifting and breaking of the fish in the partly filled box during rough weather spoiled 12 tons of fish therein.