396 F.2d 467
 The NATIONAL BOARD OF the YOUNG MEN'S CHRISTIAN ASSOCIATIONS, the Sojourner's Lodge, Masonic Temple, and the Commerce and Industry Insurance Company
v.
The UNITED STATES.
 No. 344-66.
 United States Court of Claims.
 June 14, 1968.
 
 Ronald A. Jacks, Washington, D. C., attorney of record, for plaintiffs.
 Martin Green, Washington, D. C., with whom was Asst. Atty. Gen., Clyde O. Martz, for defendant.
 Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.
 ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT.
 COWEN, Chief Judge.
 
 
 1
 Plaintiffs[1] brought this action to recover just compensation under the fifth amendment for the destruction of and damage to their properties in the Canal Zone during the course of and shortly after the Panama riot of 1964. There are two parts to plaintiffs' claim. The first and major portion is for damages inflicted on plaintiffs' buildings by the rioters after the buildings had been entered by United States troops seeking cover from snipers' bullets. In the second and lesser segment of the claim, plaintiffs seek recovery for losses alleged to have been caused after the cessation of the riot as a result of certain changes made in the Masonic Temple by the defendant for the purpose of fortifying it for use in any future riot. For the reasons hereinafter stated, we hold that plaintiffs are not entitled to recover.
 
 
 2
 The case is before us on cross-motions for summary judgment, and the basic facts have been stipulated.[2]
 
 
 3
 The buildings involved in this action are the YMCA building owned by the National Board of the Young Men's Christian Associations and the Masonic Temple owned by the Sojourner's Lodge of the Masonic Order. Both are situated on the Atlantic side of the Canal Zone in the City of Cristobal and are located next to each other just inside the Zone on Bolivar Avenue. At this location, 11th Street and Bolivar Avenue intersect and form a right angle boundary between the Canal Zone and the Republic of Panama. The Masonic Temple is located just inside the right angle, and it is bounded on the right by the YMCA which faces Bolivar Avenue and on the left by the Old Commissary Building which faces 11th Street.
 
 
 4
 On the evening of January 9, 1964, a group of 200 Panamanian students entered the Pacific side of the Zone in the vicinity of the Balboa High School and became embroiled in a dispute over the failure to fly the Panamanian flag alongside the United States flag at the school. The students left in anger without raising their flag, and, as they did so, they began to damage property in the Zone.
 
 
 5
 As stated in the introduction of the United States Presentation to the Select Committee of the Organization of American States, the "students' fury became the spark for mass incursions into the Canal Zone by Panamanian rioters at numerous points along an extended border. The mobs attacked and killed U.S. and Panamanian citizens and burned and looted their properties. A maximum effort by the Canal Zone Police force was required to prevent the mobs from reaching U.S. residential areas. The number and force of mob attacks upon persons and property in the Zone exceeded the capacity of the police to contain them, and at 8 p.m. on January 9th, the Commander of the Armed Forces in the Canal Zone assumed responsibility for law and order in the Canal Zone." [Exhibit A at VI]
 
 
 6
 The rioting first reached major proportions on the Pacific side of the Zone and at 8:30 p.m. on January 9, 1964, General O'Meara, Commander of the Armed Forces in the Canal Zone, dispatched troops to the Pacific side with instructions to clear the area of rioters and to secure it against further unauthorized intrusions. Soon, thereafter, the military units began to clear the Pacific side, encountering moderate resistance.
 
 
 7
 Rioting in the Cristobal-Colon area on the Atlantic side of the Canal Zone, 50 miles away from the Pacific side, began at 8 p.m. on the night of January 9, 1964. By 9:15 p.m., a mob of 1,500 persons had formed and proceeded to the Panama Canal Administration Building, where they raised a Panamanian flag. Shortly thereafter, a contingent of the rioters broke into, looted, and destroyed the contents of the Panama Canal Company Office and Storage Building. They then broke windows in the Masonic Temple, and after entering the YMCA building, looted and wrecked its interior.
 
 
 8
 At 9:50 p.m. on the same evening, Colonel William Sachse, Commanding Officer of the 4th Battalion, was ordered to proceed with his troops to Cristobal with the objective of clearing the rioters from the Atlantic end of the Zone and sealing the border from further encroachment. When the battalion, consisting of about 700 men, arrived in the area, a large group of the Panamanians retreated across Bolivar Avenue into the Republic of Panama. However, a number of rioters jumped from the second floor windows of the Masonic Temple and attacked the troops with lead pipes and sticks. After the Panamanians were ejected from the buildings, the troops linked up to seal off the Zone boundary. By that time, the troops were confronted with a mob of about 3,000 people, which began to assault them with a shower of rocks, bricks, plate glass, and Molotov cocktails.
 
 
 9
 Sniper fire began; one trooper was killed, two others were wounded by bullets, and many others were injured by the flying debris and Molotov cocktails. Although they were under continuous attack, the American troops were ordered not to return the fire lest innocent persons be injured in the crowded area. Therefore, only tear gas grenades were used to contain the mob and discourage the attacks. Finally, in order to protect his troops from sniper fire, the commanding officer moved them into the YMCA building, the Masonic Temple, and the adjoining Old Commissary Building shortly after midnight on January 9, 1964.
 
 
 10
 At 10 a.m. on January 10, 1964, the rioters launched a heavy attack of Molotov cocktails against the YMCA building, setting it afire. The Canal Zone firefighters, who attempted to control the blaze, were hampered by sniper fire and by 2 p.m., the troops were forced to evacuate the building and take up positions at the rear of the building in a parking lot which had been sandbagged during the night. The rioters then attacked the Masonic Temple with Molotov cocktails, and the command post which had been established in that building had to be abandoned. However, an observation post was maintained on the top floor of the structure, which was the highest building in the area. The YMCA continued to be a target for Molotov cocktails throughout the day and sniper activities continued at 12th Street and Bolivar Avenue. During the evening of January 10, the soldiers on the top floor of the Masonic Temple were under heavy sniper fire for 2½ hours. On January 11, the Old Commissary Building was totally destroyed by fire started by the Molotov cocktails.
 
 
 11
 By 2:45 p.m. on January 11, 1964, three American soldiers had been killed and twelve had been wounded by sniper fire. When these casualties were reported, the commanding officer was granted permission to allow selected marksmen using shotguns to return fire on known snipers.
 
 
 12
 On January 12, heavy sniper fire and the use of Molotov cocktails were prevalent in the Masonic Temple area, and the second story of the Masonic Temple was set afire on the same morning. Sniper and fire bomb activity continued in the area until midnight of January 12, 1964, when the crowd dispersed.
 
 
 13
 On January 13, 1964, the Panamanian National Guard took effective control of the Colon side of the boundary and hostile action in the area thereafter ceased. At 8 a.m. on Thursday, January 16, 1964, General O'Meara relinquished control of the Canal Zone to the Governor of the Canal Zone.
 
 
 14
 The YMCA's auditorium-gymnasium was totally destroyed and the remainder of the building was badly damaged. After deducting an amount which they have allocated to damage done by the rioters before the Army entered the building, the YMCA and its insurer seek recovery of $212,196 for the loss and damage to that building. Because of its predominantly concrete and brick construction, the Masonic Temple suffered considerably less damage. After again making an allowance for damage attributable to the rioters prior to Army occupancy, plaintiffs claim $32,996.70 for property loss to the Masonic Temple.
 
 
 15
 In addition to the YMCA building and the Masonic Temple, private properties of churches, steamship agencies and lodges were damaged during the riot. Also, some 160-odd automobiles were damaged or destroyed.
 
 
 16
 Publicly owned property damaged or destroyed in Cristobal included the Panama Canal Office and Storage Building, the Sanitation Office, many railroad ties, street lights, and traffic and railroad signals. A substantial portion of Government property used by the Inter-American Geodetic Survey was burned and looted. In addition, United States military personnel reported loss of household goods and possessions valued at $72,000.
 
 
 17
 * Against the foregoing factual background, our first task is to decide whether the destruction of the YMCA building and the damage to the Masonic Temple during their temporary occupancy by American troops occurred under such circumstances as to constitute a compensable taking. It is axiomatic that the fifth amendment is not suspended in wartime, but it is equally well recognized that a destruction of private property in battle or by enemy forces is not compensable. As this court declared long ago, "No government, except as a special favor bestowed, has ever paid for the property of even its own citizens in its own country destroyed in attacking or defending against a common public enemy * * *." Perrin v. United States, 4 Ct.Cl. 543, 547-548 (1968), aff'd, 79 U.S. (12 Wall.) 315, 20 L.Ed. 412 (1870). See also United States v. Pacific R.R., 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634 (1887).
 
 
 18
 The United States was not at war with the Republic of Panama at the time plaintiffs' buildings were occupied but Army troops were confronted with a large and hostile force under conditions presenting immediate danger to them, as well as to the lives and property of American citizens in the Canal Zone. In a report which both parties have agreed is a factual account of the rioting in the Cristobal-Colon area, it is stated:
 
 
 19
 * * * The second phase began with the arrival of the troops between 10:15 and 10:40 p.m., when the mob violence grew until it became a pitched battle between the rioting mob backed up by concealed snipers, on one side, and the U.S. Army troops on the other.[3]
 
 
 20
 Consequently, we believe that the same principles of law are to be applied here as obtain in a case where the military forces of this country are engaged in combat with a public enemy.
 
 
 21
 Plaintiffs have expressly excluded from their claim the damage done the YMCA building and the Masonic Temple by the rioters before the buildings were occupied by American troops. However, they stand on the proposition that their buildings were appropriated for public use, and assert that during a war or at other times when private property is used by the Government, just compensation must be paid pursuant to the fifth amendment, except when such property is deliberately destroyed to keep it from falling into enemy hands. In support of their position, plaintiffs rely primarily on the dicta contained in Mitchell v. Harmony, 54 U.S. (13 How.) 115, 14 L. Ed. 75 (1852) and United States v. Russell, 80 U.S. (13 Wall.) 623, 20 L.Ed. 474 (1871). However, neither of these cases involved a situation where private property was destroyed while serving as a temporary refuge for our military forces during an actual confrontation with hostile enemy forces. In the Harmony case, the plaintiffs' property, which consisted of mules, wagons, and goods, was taken for the purpose of strengthening the Army for its expedition to Chihuahua, which was 300 miles distant at the time, and in the Russell case, Army officials requisitioned plaintiffs' steamboats to carry Government freight for a period of from 26 to 60 days. Neither Harmony nor Russell involved impending danger in the context of a hostile confrontation similar to that which we find in the instant litigation. Instead, the property in those cases was requisitioned in a manner much akin to the procurement of goods and services under contract — in the absence of immediate danger, after deliberation, and for a somewhat later and less temporary use.
 
 
 22
 Neither of the parties has cited nor have we found any court decision presenting a factual situation similar to that now before us. In view of the broad language of the fifth amendment and the difficulty we find in determining whether compensation is required in this case, we look to the general principles announced in the decisional law to find the narrow and sometimes indistinct line that separates losses that are necessary incidents of the ravages and burdens of war from those situations where the Government is obliged to pay compensation to the owner of private property that is taken for public use.
 
 
 23
 In United States v. Caltex, Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952), which is the latest expression of the Supreme Court on the subject, compensation under the fifth amendment was denied to the owners of private property destroyed by the Army to prevent its imminent capture and use by an advancing enemy. The Harmony and Russell cases were distinguished on the ground that, in both, private property had been impressed by the Army for subsequent use by it. The Court quoted the following dictum of Mr. Justice Field in United States v. Pacific R.R., supra, and declared that it is the law today:
 
 
 24
 The destruction or injury of private property in battle, or in the bombardment of cities and towns, and in many other ways in the war, had to be borne by the sufferers alone as one of its consequences. Whatever would embarrass or impede the advance of the enemy, as the breaking up of roads, or the burning of bridges, or would cripple and defeat him, as destroying his means of subsistence, were lawfully ordered by the commanding general. Indeed, it was his imperative duty to direct their destruction. The necessities of the war called for and justified this. The safety of the state in such cases overrides all considerations of private loss. [344 U.S. at 153-154, 73 S.Ct. at 202]
 
 
 25
 As we read the decision, we think the Supreme Court also approved the general principles set forth in the Pacific Railroad case and reaffirmed the doctrine of sovereign immunity for losses attributable to the fortunes of war or public necessity in times of imminent danger or peril. In the Pacific Railroad case, Mr. Justice Field noted the distinction between the immunity of the sovereign for the temporary occupancy or destruction of private property as a necessary incident of military action urgently required to defend against an attacking enemy, and private property that is taken for later use by the Army. The Court there quoted with approval the following portion of the Veto Message of President Grant:
 
 
 26
 It is a general principle of both international and municipal law that all property is held subject, not only to be taken by the government for public uses, in which case, under the constitution of the United States, the owner is entitled to just compensation, but also subject to be temporarily occupied, or even actually destroyed, in time of great public danger, and when the public safety demands it; and in this latter case governments do not admit a legal obligation on their part to compensate the owner. [120 U.S. at 238, 7 S.Ct. at 495 (emphasis added)]
 
 
 27
 In elaborating on the exemption of the Government from liability for the temporary occupancy of private property as a measure that is necessary for the safety and efficiency of troops during military operations, the court distinguished such uses of private property from a compensable taking occurring under conditions less than those of imminent peril, as where there is a voluntary requisitioning of steamboats to transport troops or munitions of war, or of buildings to house soldiers or to store war material (i. e., Harmony and Russell).
 
 
 28
 In Franco-Italian Packing v. United States, 128 F.Supp. 408, 130 Ct.Cl. 736 (1955), this court had occasion to reexamine United States v. Pacific R.R., supra. As a result of that examination, the court, in an opinion written by Judge Laramore, declared:
 
 
 29
 The Supreme Court in United States v. Pacific Railroad, 120 U.S. 227, 7 S.Ct. 490, 30 L.Ed. 634, established the rule that the sovereign is immune from liability for confiscation of private property taken by defendant, through destruction or otherwise, to prevent it from falling into enemy hands, or to protect the health of troops, or as an incidental element of defense against hostile attack and is not compensable under the fifth amendment. [128 F.Supp. at 414, 130 Ct.Cl. at 747.]
 
 
 30
 The above-quoted expression is admittedly dictum, but we think it announces a principle of law which should be applied in deciding the issues raised by the particular facts of this case.
 
 
 31
 As we have already noted, it is a thin line which the case law has at times drawn between sovereign immunity and governmental liability. The lack of more certain guidelines is unfortunate; however, we think it is at least clear that the decisions have rather consistently placed on the opposite sides of that line a temporary occupancy of private property which is immediately necessary for the safety of troops or to meet an emergency threatening great public danger and a voluntary appropriation of private property under conditions where there is no compulsive use or occupancy in the face of imminent danger. When the facts of this case are viewed in their entirety, it is our conclusion that they fall more nearly in the first category and, therefore, necessarily place the case on the sovereign immunity side of that fine judicial line.
 
 
 32
 In view of the unusual circumstances presented by the facts of the case, we think it is also appropriate to look for guidance to the relevant reports and expressions of the Congress, just as the Supreme Court did in United States v. Pacific R.R., supra. In an elaborate report on claims growing out of the Civil War, the House of Representatives distinguished between the temporary use of property as an urgent military necessity from other takings for war purposes. The report reads in pertinent part as follows:
 
 
 33
 By the principles of universal law recognized anterior to the Constitution, in force when it was adopted, and never abrogated, every civilized nation is in duty bound to pay for army supplies taken from its loyal citizens, and for all property voluntarily taken for or devoted to "public use."
 
 
 34
 But there is a class of cases in which property, real or personal, of loyal citizens may be temporarily occupied or injured, or even destroyed, on the theater of and by military operations, either in a loyal State or in enemy's country, in time of war, as a military necessity. The advance or retreat of an army may necessarily destroy roads, bridges, fences, and growing crops.
 
 
 35
 In self-defense an army may, of necessity, erect forts, construct embankments, and seize cotton bales, timber, or stone, to make barricades.
 
 
 36
 In battle or immediately after, and when it may be impossible to procure property in any regular mode by contract or impressment, self-preservation and humanity may require the temporary occupancy of houses for hospitals for wounded soldiers, or for the shelter of troops, and for necessary military operations which admit of neither choice nor delay.
 
 
 37
 In these and similar cases the question arises whether there is a deliberate voluntary taking of property for public use requiring compensation, or whether these acts arise from and are governed by the law of overruling military necessity — mere accidents of war inevitably and unavoidably incidental to its operations — and which by international law impose no obligation to make recompense. It seems quite clear that they are of this latter class.
 
 
 38
 * * * * *
 
 
 39
 The Government has always paid loyal citizens for the use and occupation of buildings and grounds in loyal States when used for officers' quarters, regular recruiting camps, and in cases where the occupation was voluntary and the result of choice, superinduced by no overruling military necessity, and for this the law provides.
 
 
 40
 But a temporary occupancy of real estate imposed by overruling necessity — an occupancy continued during the actual existence of such impending necessity — or the application of materials to purposes of defense in an emergency, has not, by the usage of the Government, been regarded as giving any claim for compensation. [H.R. Rep't No. 262, 43d Cong., 1st Sess., pages 39, 43.]
 
 
 41
 Mindful of the Supreme Court's caveat in Caltex that each case in this category must be judged on its own facts, we refrain from laying down any broad or general rule. We decide only that the temporary occupancy of plaintiffs' buildings and the damage inflicted on them by the rioters during such occupancy did not constitute a taking of the buildings for use by the Army within the contemplation of the fifth amendment, as that amendment is interpreted by the authorities discussed above. It is abundantly clear from the record before us that the military units dispatched to the Atlantic side of the Zone by General O'Meara were not sent there for the purpose or with the intention of requisitioning or taking plaintiffs' buildings to house soldiers. Both buildings had previously been looted and damaged by the rioters. Colonel Sachse's men were ordered to remove the Panamanians from the buildings in order to prevent further loss or destruction and then to seal off the border from further incursions by the rioters into the Atlantic portion of the Canal Zone. After the Army troops became engaged in a pitched battle with a large and formidable mob and then only after one soldier was killed and many others were injured by bullets and missiles, the troops were ordered into the buildings in order to avoid further casualties among them. During the temporary occupancy of the two buildings, they were under a sustained attack by the mob until the riot ended. Moreover, it is undisputed that all of the damages included in the main portion of plaintiffs' claim were inflicted by the rioters. Consequently, we hold that the loss is one which must fall upon the plaintiffs.
 
 II
 
 42
 There remains for consideration that portion of plaintiffs' claim for loss of value and rental income arising out of alterations to the Masonic Temple, which the Government made after the cessation of the riot for the purpose of fortifying the building for use in any future riot. The alterations in the building were made to improve its security and to provide a reasonably safe place in which the Canal Zone police and the military could be stationed in the event of future disturbances in the area. Therefore, at Government expense, the windows and doors fronting 11th Street and Bolivar Avenue on the ground floor were sealed with concrete blocks and the wooden doors and windows on the other two sides were covered with sheet metal to make them fire resistant. Wire mesh was placed over all the windows on the second, third, and fourth floors, and steel shields were installed on the rooftop.
 
 
 43
 The only claim made regarding the changes is for the loss of value and rental income resulting from "sealing off the ground floor."
 
 
 44
 The plaintiffs contend that the alterations to the structure were forced upon them and that at no time did the officials of the Temple waive their right to claim a permanent loss as a result of the changes made by the Government. We find that this position is unsupported by the evidence, that the structural changes were made with the consent of the plaintiffs, and that a full accord and satisfaction was reached between the parties.
 
 
 45
 Plaintiffs correctly point out that on February 11, 1964, after the initial installations, the defendant by letter requested the Master of the Masonic Temple to confirm the fact that the changes in the building accorded with the prior verbal agreement of the parties. By reply of March 4, 1964, the master of the lodge replied that he had not specifically agreed to the complete blocking of the windows and doors on the ground floor and had understood that, in the future, the doors would be replaced and that some of the concrete window blocking would be replaced with glass brick. He ended the letter with the statement that he could not categorically agree that all the Government installations in the building were acceptable and that it might be necessary for the lodge to make a claim against the Government in the future. Had no further action been taken, plaintiffs might have a valid claim. The record is clear, however, that the parties subsequently agreed upon certain modifications in the installations which satisfied the lodge's request and conformed to its version of the verbal agreement. In reply to the March 4 letter, the Government, in a letter dated July 8, 1964, submitted to the master of the lodge a list of changes it was prepared to undertake, at Government expense, to comply with the lodge's wishes. These changes included, inter alia, replacing some of the concrete blocks used to seal the doors and windows of the ground floor with doors and sections of glass brick, plus plastering and painting the remaining concrete blocks. The master of the lodge replied on August 6, 1964, in part, that "I am pleased to advise you that the work outlined by you to be completed at Government expense will be considered as full compliance with our agreement." [Emphasis added.]
 
 
 46
 The evidence submitted with the motions of the parties consists of the correspondence between them, and it shows that the structural changes in the Temple were made with the consent of the owner. There is no indication that either party at any time considered the changes to be a "taking" within the meaning of the fifth amendment. It is clear that the only claim the Masonic Temple intended to reserve in its March 4, 1964, letter was one for specified unacceptable installations, and that those defects were later remedied the full satisfaction of the owner. Moreover, plaintiffs have failed to support their claim with any evidence that the alterations decreased the value of the property or lowered its rental value. In the absence of such proof, we may assume that the structural changes were as much a benefit to the Masonic Temple as they were to the Government, inasmuch as such changes rendered the building less vulnerable to riot damage in the future.
 
 III
 
 47
 Our conclusions stated above require the granting of defendant's motion for summary judgment, the denial of plaintiffs' motion for summary judgment, and the dismissal of plaintiffs' petition. It is so ordered.
 
 
 
 Notes:
 
 
 [1]
 The Commerce and Industry Insurance Company, the insurer of the YMCA property, joined in the action because it paid a portion of the loss under its policy
 
 
 [2]
 The parties have agreed that the material facts are set forth in the official United States Presentation to the Select Committee of the Organization of American States established under the Resolution of February 6, 1964, to investigate charges of American aggression. Several other documentary exhibits are also covered by the stipulation
 
 
 [3]
 Page 7 of fact sheet compiled by the Office of General Counsel of the Army in evidence as Exhibit B
 
 
 DAVIS, Judge (dissenting in part):
 
 48
 On the question decided in Part I of the court's opinion,[1] this is an extremely close case, teetering on the balance. The court's view is certainly tenable and may be correct, but I have come to another conclusion and therefore explain it briefly. My disagreement turns on a difference, primarily, as to the legal significance of an emergency situation or imminent hostilities, and, secondarily, as to the conclusion to be drawn from the specific facts of this case.
 
 
 49
 In one of its briefs the Government says: "the plaintiffs assume to be a matter of fact the seizure and use of their buildings as a place of refuge and defense for American troops (Pl. Br. pp. 14, 31), and on the basis of this convenient assumption argue that the United States must compensate them for its use of their property. Were their assumption true, their argument based upon it would be correct." (Emphasis added.)[2] This statement reflects — together with its counterpart, quoted in note 2 — the traditional rules as I understand them. Where private property has been destroyed or damaged as a result of armed conflict, the sovereign is not liable (i) if the damage was deliberately done to prevent its falling into enemy hands (denial destruction),[3] or (ii) if the damage occurred (as variously put) in actual battle, by "the fortunes of war", "in the path of war", "by actual and necessary military operations", through bombardment or shelling, or in attacking or defending against the enemy.[4] On the other hand, the Government is held liable where it first takes the property for its own military use, and then exposes the place to enemy attack or evokes one, leading to injury or destruction.[5] In this connection, there is no exception from liability, as I read the materials, for temporary seizures for military use in the face of imminent hostility or to meet an emergency; once the property is taken for a military use, the Government is responsible for its subsequent injury, no matter how quickly that follows upon the seizure.[6] The boundary between these latter "takings" and the "fortunes of war" cases is indeed thin, indistinct, and hard to trace. But these are our current guidelines, unsatisfactory though they be, and I do not see it as the function of this court, at this time, to alter them or build anew. We must apply them as best we can.[7]
 
 
 50
 To use the words of defendant's brief, was the Government's temporary occupation of plaintiffs' building "as a place of refuge and defense for American troops" or was it "as an incident of its task of ejecting looters and rioters and restoring order in the Canal Zone"?[8] The former would be a compensable taking for military use even though destruction followed shortly; the latter a noncompensable incident of battle. As I appraise this record, the first is the better characterization of the facts. The United States troops cleared plaintiffs' holdings of rioters and looters before the occupation of the buildings, and took up stations in the street in front of the buildings; the soldiers remained there for a while and did not withdraw into the buildings until after sniper fire had begun, and this withdrawal was made to "protect the troops from the sniper fire and early sieges of Molotov cocktails";[9] inside the buildings the soldiers erected barricades and took shelter, not only from the sniper fire but from the Molotov cocktail attacks which followed; also, a "command post" was set up in the Masonic Temple and an "observation post" on the top floor of that structure; the soldiers remained in the YMCA and the ground floor of the Masonic Temple for some 12 to 14 hours, and longer on the top of the Masonic Temple.
 
 
 51
 To me, all of this shows the seizure and use of both buildings "as a place of refuge and defense for American troops" — a place of protection, of shelter, of rest, of a command post, and of an observation point. The assaults from the Panamanian side on the buildings (for which plaintiffs now seek recovery) came about because, and after, the United States troops had entered and occupied them. The buildings were "used, occupied, etc. so as to expose that property particularly to enemy fire" (II Whiteman, op. cit. supra, at 1421). The buildings' "destruction by the enemy * * * [was] a necessary consequence of the nature of the service to which, for the public benefit, the * * * [buildings] were subjected"; "the enemy destroyed the property indeed, but only after the Government had taken it for public use, by being used by the Government, and because it was so used" (Putegnat's Heirs, supra). "When the Government's troops entrenched themselves in front of claimant's habitation and took possession they made it the object of the enemy's attack. They condemned it specially to public use. Claims for damages to it were taken out of the field of the incidental results of war, the Government having invited its destruction" (Annuziata Petrocelli, supra, at 763).
 
 
 52
 Conversely, these facts show, to my mind, that the injury to plaintiffs' property did not occur directly "as an incident of [the troops'] task of ejecting looters and rioters and restoring order in the Canal Zone" (as defendant puts it), or because the buildings were shelled or burnt in the course of a running battle in the area (as were other structures in the Zone), or as "mere accidents of war inevitably and unavoidably incidental to its operations" (H.R. Rep. No. 262, supra).[10]
 
 
 53
 For these reasons, I would hold for the plaintiffs on this branch of their claim.
 
 
 
 Notes:
 
 
 [1]
 I join in Part II of the opinion
 
 
 [2]
 The brief goes on: "However, the stipulated facts, which we shall review subsequently, clearly show that the plaintiffs' buildings were not appropriated by the Army for a public use, but were merely entered by the Armyas an incident of its task of ejecting looters and rioters and restoring order in the Canal Zone" (emphasis added).
 
 
 [3]
 United States v. Caltex (Philippines), Inc., 344 U.S. 149, 73 S.Ct. 200, 97 L. Ed. 157 (1952)
 
 
 [4]
 See United States v. Pacific R.R., 120 U.S. 227, 234-235, 238-239, 7 S.Ct. 490, 30 L.Ed. 634 (1887); United States v. Caltex (Philippines), Inc., supra, 344 U. S. at 153-154, 155-156, 73 S.Ct. 200, 97 L.Ed. 157; Perrin v. United States, 4 Ct.Cl. 543, 547-548 (1868), aff'd 12 Wall. 315, 20 L.Ed. 412 (1870); Franco-Italian Packing Co. v. United States, 128 F.Supp. 408, 414-415, 130 Ct.Cl. 736, 747 (1955); II Whiteman, Damages in International Law 1421 (1937)
 
 
 [5]
 See Mitchell v. Harmony, 13 How. 115, 133-134, 14 L.Ed. 75 (1852); United States v. Russell, 13 Wall. 623, 627-628, 20 L.Ed. 474 (1871); United States v. Pacific R.R., supra, 120 U.S. at 234, 239, 7 S.Ct. 490; Walker v. United States, 34 Ct.Cl. 345, 347 (1899); Borchard, Diplomatic Protection of Citizens Abroad 262-64 (1915); II Whiteman, op. cit. supra, at 1421; Putegnat's Heirs (U. S. v. Mexico), IV Moore, International Arbitration, 3718-3720 (1898); American Elec. & Mfg. Co. (United States v. Venezuela), Ralston's Report, 128 (1904); Annuziata Petrocelli (Italy v. Venezuela), Ralston's Report 762, 763 (1904)
 
 
 [6]
 See II Whiteman, op. cit. supra, at 1421 ("Where, however, real property is used, occupied, etc. so as to expose that property particularly to enemy fire, compensation is made for such use on the ground that the property has been seized for public use and destroyed as so employed."); Putegnat's Heirs, supra (house seized and fortified, then destroyed by enemy forces); American Elec. & Mfg. Co., supra (telephone plant damaged, after Government troops seized it during an attack); Annuziata Petrocelli, supra (government troops entrenched themselves in front of claimant's house and took possession of it, leading to an enemy attack)
 The House Report (H.R. Rep. No. 262, 43d Cong., 1st Sess.) on which the majority relies does say that compensation need not be paid for "the temporary occupancy of houses for hospitals for wounded soldiers, or for the shelter of troops, or for necessary military operations which admit of neither choice or delay", but I do not think that, in this respect, the congressional report states the rule correctly. The authorities cited in footnote 5 and in the first paragraph of this footnote — particularly the actual decisions of international arbitral tribunals — are to the contrary. I do not understand the dictum in Franco-Italian Packing Co. v. United States, supra, 128 F.Supp. at 414, 130 Ct.Cl. at 747, (noncompensability of property seized "as an incidental element of defense against hostile attack") as covering a seizure of property for military use, and the subsequent destruction of that property, but merely destruction or injury by the Government's troops in the course of a battle.
 
 
 [7]
 Nor does the majority of the court attempt to refashion the governing rules, as it sees them
 
 
 [8]
 I judge from its briefs that the defendant's position on the legal irrelevance of an emergency situation or imminent hostilities — if a "taking" in fact occurs — is closer to mine than to the court's
 
 
 [9]
 The United States' official presentation before the OAS said that the platoons were moved to the buildings "to provide more protection from the sniper fire"; the General Counsel of the Army said that the purpose of the withdrawal was "in order to protect the troops from the sniper fire"; the commanding officer of the U.S. Forces in Cristobal described the maneuver as providing "cover" for the troops from sniper fire
 
 
 [10]
 For instance, the damage to the structures occurring before the rioters were evicted by the troops or in the course of evicting them (losses for which plaintiffs do not ask recovery) is non-compensable. Similarly, no damages would be payable if the later injury to the buildings were caused by efforts of soldiers stationed on the street to put out fires, or to prevent the storming of the buildings, or to stop renewed entry by rioters into the buildings